# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20595

United States Court of Appeals
Fifth Circuit

**FILED**
September 13, 2017

Lyle W. Cayce
Clerk

IQ PRODUCTS COMPANY,

> Plaintiff - Appellant

v.

WD-40 COMPANY,

> Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, GRAVES, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Plaintiff-Appellant IQ Products Co. sued Defendant-Appellee WD-40 Co., and WD-40 filed a motion to compel arbitration. Over IQ's objections, the district court granted the motion, finding that the parties intended to arbitrate the "gateway issue" of whether their claims were arbitrable. After prevailing in arbitration, WD-40 filed a motion to confirm its award. IQ filed a motion to vacate the award on the ground that the arbitrators had exceeded their authority because the claims were not arbitrable. The district court denied IQ's motion to vacate and granted WD-40's motion to confirm. IQ appealed, and we now affirm.

No. 16-20595

I

WD-40 is a widely used household lubricant often packaged in aerosol cans. WD-40 Company produces a lubricant concentrate and develops specifications for the chemical formulas, packaging, and manufacturing of its products, but uses independent contract packagers to manufacture the products according to those specifications. In 1992, IQ Products Company, a longtime manufacturer of aerosol and non-aerosol consumer products, began serving as a contract packager for WD-40 branded products.

In 1996, WD-40 began to develop a new WD-40 formula using carbon dioxide as the propellant rather than propane/butane. Around the same time, WD-40 proposed that it and IQ enter into a written contract concerning WD-40 products. IQ had concerns about engineering challenges associated with replacing the low-pressure propane/butane propellant with a high-pressure carbon–dioxide propellant. IQ described its concerns in a letter from IQ's Chief Executive Officer, Yohanne Gupta, about negotiation of the proposed agreement:

> As I am not aware of the extent of research and development work which WD-40 may have conducted already for the new formula, or the research and development work which WD-40 intends to conduct henceforth, and as I am not aware of the new specifications for the WD-40 product, I suggest that this Agreement be executed after this information is established. Otherwise, my agreeing to the Agreement at present will clearly not include the scope of work, cost of product, and IQ's responsibilities for the new formula WD-40 products.

IQ requested that the parties meet to discuss IQ's concerns.

At the parties' meeting on April 10, 1996, IQ agreed to execute the Manufacturing and License and Product Purchase Agreement (the "1996 Agreement"), but added a handwritten notation expressly limiting the definition of the "Product" to which the agreement applied to "a penetrating,

2

lubricating spray product identified and labeled 'WD-40' based on propane/butane-propelled formulation and specifications." This revision was initialed by both parties and dated April 10, 1996, the same date the 1996 Agreement was executed.

The 1996 Agreement is the only contract between the parties that contains an arbitration clause. This clause provides:

> Any controversy or claim arising out of, or related to this Agreement, or any modification or extension thereof, shall be settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association . . . .

The 1996 Agreement also includes an integration clause, which states that the agreement "may be amended or modified only by a written instrument signed by an officer of both parties."

After receiving WD-40's assurances that it had performed extensive testing of the carbon dioxide-based formula, IQ began manufacturing WD-40 products with that formula and new specifications. The parties did not consider executing any other written agreement until 2011.

In 2011, WD-40 issued a Request for Proposal (RFP) to restructure its supply-chain business model and asked its packagers—including IQ—to bid for long-term supply agreements. WD-40 selected IQ's bid in July 2011, and gave written notice of its intent to terminate the 1996 Agreement to allow the parties to negotiate a new long-term agreement.

During the parties' negotiations of the new long-term agreement, IQ informed WD-40 that an internal audit had revealed a problem with WD-40's packaging specifications. IQ recommended that WD-40 address the alleged problem by revising its design and specifications. IQ also expressed concerns about WD-40's quality control specifications and told WD-40 that it would need to raise prices to account for increased costs and expenses.

3

No. 16-20595

WD-40 did not agree with IQ's recommendations or proposed price increases, and negotiations over the long-term agreement broke down. In May 2012, WD-40 terminated the parties' business relationship.

II

IQ sued WD-40 on May 31, 2012 seeking over $40 million. The operative complaint alleged breach of contract and multiple tort claims in connection with WD-40's terminating the parties' business relationship. Specifically, IQ claimed that WD-40 breached the "Long-Term Agreement"—which IQ alleged the parties entered into when WD-40 accepted IQ's RFP bid in July 2011.

WD-40 filed an answer that included counterclaims and a motion to compel arbitration pursuant to the 1996 Agreement's arbitration clause. Over IQ's objections, the district court determined that the parties agreed to have the issue of arbitrability of the parties' dispute decided by the arbitrator and compelled arbitration, staying the case pending the arbitrator's decision on arbitrability.

An independent arbitrator determined that both parties' claims were arbitrable, and a three-arbitrator panel denied IQ's request for a redetermination of arbitrability. However, the panel allowed the parties to present evidence regarding arbitrability during the hearing and reserved the right to consider its jurisdiction in the final decision. Several months later, the arbitration panel issued an interim order and again concluded that all of the parties' claims were arbitrable. The panel issued a final arbitration award in favor of WD-40 on November 6, 2015.

WD-40 moved to confirm the arbitration award in the district court. IQ filed a response and a motion to vacate the arbitration award, arguing that the arbitration panel lacked jurisdiction to arbitrate its claims. The district court granted WD-40's motion to confirm the arbitration award and denied IQ's

No. 16-20595

motion to vacate. IQ appealed from both the January 10, 2013 order compelling arbitration and the August 25, 2016 final judgment.

III

We review de novo a district court's ruling on a motion to compel arbitration. *Janvey v. Alguire*, 847 F.3d 231, 240 (5th Cir. 2017); *Kubala v. Supreme Prod. Servs. Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). Likewise, we also review de novo a district court's confirmation of an arbitration award. *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 674 (5th Cir. 2012). The district court's factual findings, however, are reviewed for clear error. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 947–49 (1995); *Janvey*, 847 F.3d at 240.

IV

IQ argues that the district court erred in granting the motion to compel arbitration on the issue of arbitrability. According to IQ, the district court should have decided arbitrability and none of the claims at issue in this dispute is arbitrable.

A

In *Kubala v. Supreme Production Services, Inc.*, we outlined the framework for determining whether to submit the issue of arbitrability to arbitration. 830 F.3d at 201–02; *see also Reyna v. Int'l Bank of Commerce*, 839 F.3d 373, 378 (5th Cir. 2016). First, the court must determine "whether the parties entered into *any arbitration agreement at all.*" *Kubala*, 830 F.3d at 201. This first step is a question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims. *Id.* at 201–02. If the court finds there is a valid agreement to arbitrate, the second step is limited: the court must determine whether the agreement contains a valid delegation clause— "that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Id.* at 202. "Although there is a strong federal policy

5

favoring arbitration, 'this federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'" *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (quoting *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options,* 514 U.S. at 944 (alterations in original) (quoting *AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)).

If the court finds that there is "clear and unmistakable" evidence that the parties intended to arbitrate arbitrability, and, thus, that there is a valid delegation clause, "the motion to compel arbitration should be granted in almost all cases." *Kubala*, 830 F.3d at 202. In some cases, however, the argument that a particular dispute is covered by the arbitration agreement will be so untenable that the district court may decide the "gateway" issue of arbitrability despite a valid delegation clause. *Douglas v. Regions Bank*, 757 F.3d 460, 462–63 (5th Cir. 2014). Accordingly, in *Douglas v. Regions Bank*, this court adopted a two-step test stating that the issue of arbitrability must be submitted to arbitration if (1) the parties "clearly and unmistakably" intended to delegate the power to decide arbitrability to an arbitrator; and (2) the assertion of arbitrability is not "wholly groundless." *Id.* at 462, 463. Stated differently, "even if the court finds that the parties' intent was clear and unmistakable that they delegated arbitrability decisions to an arbitrator, the court may make a second more limited inquiry to determine whether a claim of arbitrability is 'wholly groundless.'" *Id.* at 463 (quoting *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 718 F.3d 1336, 1346–47 (Fed. Cir. 2013), *vacated as moot*, 134 S. Ct. 1876 (2014)); *see also Kubala*, 830 F.3d at 202 & n.1 (explaining that the "wholly groundless" inquiry is a "narrow

No. 16-20595

exception" to the general rule that a valid delegation clause means that arbitrability must be arbitrated).

Here, there is no dispute at the first step in the *Kubala* framework: the 1996 Agreement contains an arbitration clause, and IQ acknowledges that this arbitration clause covers some set of claims. The next step is to apply the two-prong *Douglas* test.

B

The first prong of the *Douglas* test asks whether the parties clearly and unmistakably intended to delegate the issue of arbitrability to the arbitrator. Here, IQ waived its challenge to the district court's conclusion on this prong by conceding it before the district court. In its motion to vacate the arbitration award, IQ noted that the district court "considered [the delegation issue] at length," and that "IQ does not challenge that aspect of the decision." Similarly, in its objections to the magistrate judge's recommendation on the motion to vacate, IQ stated that "[s]ince there was a clear delegation of the arbitrability determination in *Douglas*, as there is here, the outcome turned on the second step in the *Douglas* analysis." IQ may not argue on appeal what it conceded to the district court. *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002).[1]

---

[1] Notwithstanding the existence of a delegation provision, IQ argues on appeal that in determining whether the parties clearly and unmistakably intended to delegate arbitrability to the arbitrator, "a court must first rule on whether the arbitration clause applies to the parties' particular dispute." IQ focuses on language in the Supreme Court's opinion in *First Options of Chicago, Inc. v. Kaplan*, where the Court explained that "the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." 514 U.S. at 943 (emphasis in original). IQ argues that the Court's emphasis on "that" "indicates that every possible dispute between the parties is not subject to a ruling on arbitrability by an arbitrator. If a contract does not apply to a particular matter, an arbitration clause cannot apply to a dispute that does not involve that subject." IQ's reliance on *First Options* is misplaced. Further context from that opinion makes clear that the phrase "that matter" refers to *the matter of arbitrability*, not the particular merits claims. *See* 514 U.S. at 943 (observing that the question of who decides arbitrability is answered by looking to whether the parties agreed to submit the question of arbitrability to arbitration). *First*

No. 16-20595

C

At the second step of the *Douglas* test, the court must determine whether the assertion of arbitrability is "wholly groundless." 757 F.3d at 463–64. An assertion of arbitrability is not "wholly groundless" if "there is a legitimate argument that th[e] arbitration clause covers the present dispute, and, on the other hand, that it does not." *Id.* at 463 (quoting *Agere Systems, Inc. v. Samsung Elecs. Co.*, 560 F.3d 337, 340 (5th Cir. 2009)). If the court finds the assertion of arbitrability to be wholly groundless, however, the court should not enforce the delegation clause. *Kubala*, 830 F.3d at 202 n.1.

The inquiry at the second step is limited, and cases in which an assertion of arbitrability is wholly groundless are rare:

> Such cases are exceptional, and the rule in *Douglas* is not a license for the court to prejudge arbitrability disputes more properly left to the arbitrator pursuant to a valid delegation clause. So long as there is a "plausible" argument that the arbitration agreement requires the merits of the claim to be arbitrated, a delegation clause is effective to divest the court of its ordinary power to decide arbitrability.

*Id.* Still, even though the inquiry at the second step is "limited," it "necessarily requires the courts to examine and, to a limited extent, construe the underlying agreement." *Douglas*, 757 F.3d at 463 (citation omitted).

The parties agree that the 1996 Agreement is governed by California law and that the panel should apply that state's contract law in its "limited" analysis of the scope of the arbitration provision. *See First Options*, 514 U.S. at 944. Under California law, "it is fundamental that a contract must be so interpreted as to give effect to the intent of the parties at the time the contract was entered into, and that whenever possible, that intention is to be

---

*Options*, therefore, does not support IQ's argument that the court should consider the scope of the arbitration agreement at the first step of the *Douglas* test.

ascertained from the writing alone." *Oakland-Alameda Cty. Coliseum, Inc. v. Oakland Raiders, Ltd.*, 243 Cal. Rptr. 300, 304 (Ct. App. 1988) (citing Cal. Civ. Code §§ 1636, 1639).

> The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968).

The first recital in the 1996 Agreement—which includes the handwritten insertion—defines the "Product" as "a penetrating, lubricating spray product identified and labeled 'WD-40' based on propane/butane-propelled formulation and specifications." The agreement grants IQ "a non-exclusive right to manufacture the Product" and details the parties' rights and obligations in connection with manufacturing and packaging the Product. The arbitration clause is expressly limited to claims "arising out of, or related to" the 1996 Agreement. "[E]ven under a very broad arbitration provision such as 'any controversy or claim arising out of or relating to this agreement,' . . . claims must 'have their roots in the relationship between the parties which was created by the contract.'" *Rice v. Downs*, 203 Cal. Rptr. 3d 555, 565 (Ct. App. 2016) (emphasis added) (citation omitted); *see also Berman v. Dean Witter & Co., Inc.*, 119 Cal. Rptr. 130, 133 (Ct. App. 1975). IQ argues that this language indicates that the parties intended to arbitrate disputes "arising out of or relating to" only propane/butane-propelled products. Because the claims in this litigation relate to carbon dioxide-propelled products, IQ contends that the arbitration provision cannot possibly apply to this dispute.

IQ additionally points to the March 12 letter in which IQ expressed concerns about the development of the carbon dioxide-propelled product and

appeared to condition executing the 1996 Agreement on limiting its scope to propane/butane-propelled products. IQ argues that this letter proves that the parties specifically negotiated for the 1996 Agreement to cover only propane/butane-propelled products.

On the other hand, WD-40 points to the parties' subsequent conduct as proof that the parties continued to operate under the 1996 Agreement after WD-40 replaced the propane/butane-propelled products with carbon dioxide-propelled products. IQ and WD-40 agree that the parties continued to produce propane/butane-propelled products for only a few months after executing the 1996 Agreement and then transitioned to carbon dioxide-propelled products. The 1996 Agreement specifies that it shall be ongoing until terminated, and the parties continued their business relationship after the formula transition without discussing the execution of another agreement.

WD-40 further points to correspondence between the parties referencing the ongoing validity of the 1996 Agreement. In a July 9, 2011 letter to IQ confirming the award of business, WD-40 gave "formal notice to terminate the [1996 Agreement] between the parties as laid out in Section 13 of said agreement to allow us to re-negotiate the terms and conditions of the contract to reflect the future state of business between the parties." There is no evidence that IQ objected to the ongoing validity of the 1996 Agreement at this time. After negotiation of the long-term agreement began to break down in 2012, WD-40 sent several letters that again stated its understanding that the 1996 Agreement governed the parties' business relationship and that termination would proceed according to the 1996 Agreement's procedures. In response, IQ pointed to the handwritten revision in the 1996 Agreement, which IQ maintained limited the scope of the agreement.

No. 16-20595

Considering all the "objective manifestations of the parties' intent" properly before the district court,[2] "including the words used in the [1996 Agreement], as well as extrinsic evidence of such objective matters and the surrounding circumstances under which the parties negotiated [and] entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties," *see People v. Shelton*, 125 P.3d 290, 294 (Cal. 2006), there is a plausible argument that the parties intended for the 1996 Agreement, or an "extension" of it, to govern manufacturing and packaging carbon dioxide-propelled products after WD-40 transitioned formulas.

Therefore, WD-40's assertion that the parties' dispute "aris[es] out of, or relat[es] to [the 1996 Agreement]" is not wholly groundless. In light of the "exceptional" nature of the wholly groundless test and the competing, plausible interpretations of the 1996 Agreement's meaning and scope, we conclude that WD-40's assertion of arbitrability is *not* wholly groundless. Accordingly, we affirm the district court's order compelling arbitration.

V

IQ also argues that the district court erred in confirming the arbitration award and that the arbitration award should be vacated under 9 U.S.C. § 10(a)(4) because the arbitrators "exceeded their powers" by concluding that the dispute was arbitrable. In support, IQ reiterates its arguments against submitting the issue of arbitrability to arbitration. As explained above, the parties clearly and unmistakably delegated the gateway issue of arbitrability to arbitration, and the assertion of arbitrability was not wholly groundless.

---

[2] IQ argues that WD-40's argument improperly relies on evidence that was not before the district court when the court decided the motion to compel. We have considered only materials in the record at the time the district court compelled arbitration in determining whether the assertion of arbitration is wholly groundless.

11

Thus, the arbitrators acted within their authority in deciding that the dispute was arbitrable, and the district court was correct to deny IQ's motion to vacate the award under § 10(a)(4).

## VI

For the foregoing reasons, we AFFIRM the district court's order compelling arbitration and final judgment.