# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2019

Lyle W. Cayce
Clerk

No. 17-20550

LLOYD'S SYNDICATE 457; LLOYD'S SYNDICATE 1036; LLOYD'S SYNDICATE 1084; LLOYD'S SYNDICATE 1209; LLOYD'S SYNDICATE 1225, et al

>           Plaintiffs - Appellants

v.

FLOATEC, L.L.C., doing business as FloaTEC Solutions, L.L.C.

>           Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.
STUART KYLE DUNCAN, Circuit Judge:

This case concerns a disputed siting of Big Foot in the Gulf of Mexico. We refer to a floating oil-drilling platform that rests on four massive columns—hence the name "Big Foot"—moored by steel tendons to the ocean floor. Chevron, which operates and co-owns Big Foot, contracted with FloaTEC to engineer the tendons. During installation in 2015, several tendons failed, causing Chevron huge losses. Big Foot was insured by various Lloyd's of London syndicates (collectively, "Underwriters") through a policy issued to Chevron. To cover the tendon mishap, Underwriters paid Chevron over $500 million and then went looking to recoup that money. Among others,

Underwriters sued FloaTEC. Underwriters claimed that, having paid Chevron's losses under the policy, they were subrogated to Chevron's right to sue FloaTEC for damages caused by the tendon failures.

Eventually the case landed in federal district court and FloaTEC moved to dismiss. FloaTEC argued that it qualified as an "Other Assured" under Underwriters' policy and that the policy waives subrogation against "Other Assureds"—hence Underwriters' subrogation-based claims should fail. Underwriters responded in two ways. First, they argued that the subrogation issue should be decided by an arbitrator, not the district court, by virtue of the broad arbitration clause in Chevron's contract with FloaTEC. Second, Underwriters argued that, in any event, FloaTEC was not an "Other Assured" under a proper reading of the policy.

The district court sided with FloaTEC on both points. It decided the arbitration clause did not apply because Underwriters were not a party to the Chevron/FloaTEC contract. It then decided FloaTEC did qualify as an "Other Assured" under the policy, thus enabling FloaTEC to raise the subrogation waiver. The court dismissed Underwriters' claims with prejudice.

Underwriters appeal both issues. We affirm.

## I.

### A.

Big Foot is a major deepwater oil drilling project in the Gulf of Mexico off the Louisiana coast. It is located on the Outer Continental Shelf in the Walker Ridge Area, Block 29, about 225 miles south of New Orleans. The project is operated by Chevron, which co-owns it with Statoil Gulf of Mexico LLC and Marubeni Oil & Gas (USA) Inc. As part of the project, in 2015, Chevron began to build and install an "extended tension-leg platform" that would be anchored to the seafloor almost a mile below. This is a photo of the platform in transit to Walker Ridge:

No. 17-20550



The platform would be kept stationary by sixteen steel tendons attached to pilings driven into the seafloor. These tendons were critical to the floating platform's stability.

Chevron contracted with FloaTEC to provide engineering services in connection with Big Foot, including the design and installation of the tendons. We will refer to the Chevron/FloaTEC agreement as the "Chevron/FloaTEC Contract" or simply the "Contract." The Contract required FloaTEC to maintain specific kinds of insurance related to the performance of its duties on the project. The Contract also included a broad arbitration clause, empowering a chosen arbitrator or arbitrators to "rule on objections concerning jurisdiction, including the existence or validity of this arbitration clause and existence or the validity of this Contract[.]"

Big Foot was insured by Underwriters through an Offshore Construction Project Policy with Chevron. We will refer to this Underwriters/Chevron agreement as the "Underwriters/Chevron Policy" or

simply as the "Policy." The Policy was written on a "WELCAR 2001" form, a standard construction risk policy developed for the offshore energy market at Lloyd's in the late 1990s. *See, e.g.,* Tim Taylor, *Offshore Energy Construction Insurance: Allocation of Risk Issues*, 87 TUL. L. REV. 1165, 1170 (2013) ("Taylor"). Risks covered by the Policy included physical loss or damage to Big Foot incurred during the project's design and engineering. The Policy included a clause stating that Underwriters agreed to "waive rights of subrogation" against any "Principal Assureds" or "Other Assureds." "Other Assureds" were defined in a separate section of the Policy to include "[a]ny" other companies with whom Chevron had "entered into written contract(s) in connection with the [Big Foot] Project."

In mid-2015, before the platform's stabilizing tendons had been installed, nine of the sixteen tendons detached from their supporting buoys and plummeted to the seafloor. An investigation revealed that the bolts holding the tendons to the buoys had come loose. Chevron rejected the remaining seven tendons and had them sent back to shore. The failure of the tendons and the resulting delay to Big Foot caused Chevron huge losses. As a result, Underwriters paid Chevron over $500 million under the Policy.

B.

Seeking to recoup those payments, Underwriters filed a lawsuit in a Texas state court in May 2016, naming as defendants various contractors connected to Big Foot, including FloaTEC. Underwriters alleged FloaTEC had negligently designed and manufactured the tendons and attachment bolts and had therefore caused the damages to Big Foot. Prior to service of process, claims against all defendants except FloaTEC were dropped. FloaTEC removed the case to federal court.

Underwriters then filed an amended complaint, adding the claim that FloaTEC breached its contract with Chevron. Underwriters' claims against

No. 17-20550

FloaTEC were all based on subrogation—meaning Underwriters sought to stand in Chevron's shoes by virtue of having paid Chevron's losses under the Policy. *See* LA. CIV. CODE art. 1825 (subrogation is "the substitution of one person to the rights of another" and "may be conventional or legal"); *id.* art. 1827 ("conventional" subrogation occurs when "[a]n obligee who receives performance from a third person . . . subrogate[s] that person to the rights of the obligee, even without the obligor's consent"); *see also, e.g., Old Repub. Life Ins. Co. v. Transwood, Inc.*, 2016-0552 (La. App. 1 Cir. 6/2/17); 222 So.3d 995, 1005 (explaining that, "[u]nder Louisiana law, although an insurer which pays claims on behalf of an insured is not entitled to legal subrogation, it may still be entitled to conventional subrogation if appropriately provided in the contract of insurance") (citing *Watters v. State Dep't of Transp. & Devel.*, 33,870 (La. App. 2 Cir. 9/27/00); 768 So.2d 733, 737).

FloaTEC moved to dismiss for failure to state a claim and, alternatively, to compel arbitration if the court found Underwriters had stated a claim. FloaTEC's argument for dismissal hinged on three clauses in the Underwriters/Chevron Policy. The first clause, entitled "Subrogation," states:

> Underwriters shall be subrogated to all rights which the Assured may have against any person or other entity, *other than Principal Assureds and Other Assureds*, in respect of any claim or payment made under the Policy (emphasis added).

The second clause, entitled "Waiver of Subrogation," states:

> *Underwriters agree to waive rights of subrogation against any* Principal Assured(s) and/or *Other Assured*(s) including drilling contractors and/or their sub-contractors (emphasis added).

Finally, the third clause defines "Other Assureds" to include:

> [a]ny other company, firm, person, or party . . . with whom [various entities including Chevron] have entered into written contract(s) in connection with the [Big Foot] Project."

5

No. 17-20550

FloaTEC argued that it qualified as an "Other Assured" and that Underwriters' claims were therefore barred by the Policy's subrogation waiver. Underwriters opposed FloaTEC's motion, arguing (1) FloaTEC was not an "Other Assured" under the Policy, and (2) FloaTEC had waived any right to arbitration by moving to dismiss.

The district court agreed with FloaTEC that it was an "Other Assured" under the Policy and that Underwriters' claims were thus barred by the subrogation waiver. The court therefore dismissed Underwriters' claims with prejudice for failure to state a claim.[1] Underwriters appeal.

## II.

We review *de novo* a dismissal for failure to state a claim, asking whether the plaintiff "fail[ed] to allege any set of facts in support of his claim which would entitle him to relief." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). We also review *de novo* a district court's interpretation of a contract. *Greenwood 950, LLC v. Chesapeake Louisiana, LP*, 683 F.3d 666, 668 (5th Cir. 2012); *Steel Warehouse Co. v. Abalone Shipping Ltd. of Nicosai*, 141 F.3d 234, 236–37 (5th Cir. 1998).

## III.

Underwriters' appeal requires us to consider two related issues. First, we must decide whether the district court improperly disregarded the arbitration clause in the Chevron/FloaTEC Contract when it ruled, as an initial matter, on FloaTEC's motion to dismiss. If we decide that the district court properly considered FloaTEC's motion to dismiss before any arbitrability

---

[1] In the order dismissing FloaTEC, the district court also denied a motion to dismiss or to compel arbitration filed by another defendant, American Global Maritime, Inc., which had been added by Underwriters' amended complaint. The court subsequently granted Underwriters' motion for partial final judgment under Federal Rule of Civil Procedure 54(b), allowing Underwriters to appeal the dismissal of its claims against FloaTEC. *See, e.g., Johnson v. Ocwen Loan Servicing*, LLC, 916 F.3d 505, 507 (5th Cir. 2019).

No. 17-20550

issue, then, second, we must decide whether the court's ruling on the motion to dismiss was correct. We consider each issue in turn.

## A.

Underwriters argue that the Contract's delegation clause required the district court to send their claims to arbitration instead of ruling on FloaTEC's motion to dismiss. That clause, Underwriters assert, "clearly and unmistakably" delegates to the arbitrator all "gateway arbitrability issues," including whether the Policy's subrogation waiver bars their claims. *See, e.g., Petrofac, Inc. v. DynMcDermott Petroleum Oper. Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (parties must "'clearly and unmistakably provide'" that they have agreed to "arbitrate arbitrability") (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).[2] According to Underwriters, the clause prohibited the court from ruling on FloaTEC's motion to dismiss because "a valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199 (5th Cir. 2016) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). By ruling on that motion, say Underwriters, the court let FloaTEC "game the system"—that is, "seek[ ] a decision on the merits while keeping the arbitration option as a backup plan in case the effort fails." *In re Mirant*, 613 F.3d 584, 590 (5th Cir. 2010).

Underwriters misread our precedent. To assess whether a claim must be arbitrated, we follow a two-step analysis. At step one, "the court must

---

[2] As already explained, the delegation clause provides that "[t]he . . . arbitrators have the power to rule on objections concerning jurisdiction, including the existence or validity of this Contract." Given our resolution of this issue, we need not determine whether Underwriters are correct that the clause "clearly and unmistakably" delegates arbitrability to the arbitrator. *Cf., e.g., Petrofac*, 687 F.3d at 675 (explaining that "the express adoption of [American Arbitration Association] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability").

determine 'whether the parties entered into *any arbitration agreement at all*.'" *IQ Prod. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017) (quoting *Kubala*, 830 F.3d at 201). "This first step is a question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *Id.* (citing *Kubala*, 830 F.3d at 201–02). This inquiry is for the court: "Where the very existence of any [arbitration] agreement is disputed, it is for the *courts* to decide at the outset whether an agreement was reached[.]" *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003) (emphasis added); *see also, e.g., DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 (5th Cir. 2011) ("[It] is for the courts and not the arbitrator to decide in the first instance . . . whether the parties entered into an arbitration agreement in the first place."). Only if we answer "yes" at the first step do we proceed to the second. At step two, we engage in a "limited" inquiry: "[W]hether the [parties'] agreement contains a valid delegation clause." *IQ Prod.*, 871 F.3d at 348 (citing *Kubala*, 830 F.3d at 202). We ask only whether there is "'clear and unmistakable' evidence" that the parties intended to arbitrate. *Id.*[3] If so, a "motion to compel arbitration should be granted in almost all cases." *Id.* (quoting *Kubala*, 830 F.3d at 202).

Underwriters skip the first step of the analysis. They would compel arbitration of their claims against FloaTEC based on the Contract's delegation clause. But that is step two. Underwriters must first contend with the step one

---

[3] Along with other circuits, we previously recognized a narrow exception to this rule when "a claim of arbitrability is 'wholly groundless.'" *IQ Prod.*, 871 F.3d at 349 (quoting *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 718 F.3d 1336, 1346–47 (Fed. Cir. 2013), *vacated as moot by LG Electronics, Inc. v. InterDigital Commc'ns, LLC*, 572 U.S. 1056 (2014)). This "wholly groundless" exception was recently abrogated by the Supreme Court in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019). That development leaves intact the remainder of our two-part framework for assessing a claim's arbitrability. More to the point, *Schein*'s abrogation of the wholly groundless exception has no impact on this case since it altered step two of our framework, and here we apply only step one.

question, which is whether they "form[ed] a valid [arbitration] agreement" with FloaTEC to begin with. *IQ Prod.*, 871 F.3d at 348. FloaTEC denies this strenuously: It points out that Underwriters are not parties to the Contract and, moreover, that the only agreement Underwriters are parties to (the Underwriters/Chevron Policy) bars subrogation against "Other Assureds" like FloaTEC. *See infra* III.B. Hence FloaTEC moved to dismiss Underwriters' claims, which are based entirely on subrogation.

The district court correctly treated this subrogation issue as a step one inquiry because it goes to whether any arbitration agreement exists between Underwriters and FloaTEC. If the Policy bars Underwriters from stepping into Chevron's shoes and benefitting from the Contract's delegation clause, then Underwriters and FloaTEC never "entered into *any arbitration agreement at all.*" *IQ Prod.*, 871 F.3d 344, 348. We have consistently treated attacks on an arbitration agreement's existence as step one matters for courts, not arbitrators. *See, e.g., Will-Drill*, 352 F.3d at 216 & nn. 26–28 (treating as a step one inquiry cases where "the parties resisting arbitration attack the existence of the entire agreement, not the arbitration clause specifically"). For example, we have followed sister circuit cases that "refus[ed] to order arbitration of disputes where one party claims that it is not bound by the arbitration agreement . . . because it was not an original party to the agreement." *Id.* at 216 (discussing *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851 (11th Cir. 1992); *Joseph Co. v. Mich. Sugar Co.*, 803 F.2d 396 (8th Cir. 1986)). The subrogation issue here falls into the same category: FloaTEC argues that the Policy's subrogation bar means Underwriters cannot step into the Chevron/FloaTEC Contract containing the arbitration agreement. By deciding FloaTEC's motion to dismiss at the outset, the district court properly resolved

that contract-formation issue, which is "for the courts and not the arbitrator to decide in the first instance." *DK Joint Venture 1*, 649 F.3d at 317.[4]

Underwriters cannot avoid this outcome by calling the subrogation issue a "merits-based affirmative defense" to its claims against FloaTEC. That again ignores that we have two contracts here, not one. If we were dealing with a disagreement between Chevron and FloaTEC concerning FloaTEC's engineering of Big Foot's tendons, we might have a "merits-based" issue that would presumably have to be arbitrated under the Contract. We have nothing like that here, however. FloaTEC argues Underwriters were not parties to the Contract *at all* and so could not invoke the Contract's delegation provision in the first place. This is not a dispute about the "merits" of Underwriters' claims; it is "a simpler type of dispute which, we have held, is for the courts and not the arbitrator to decide in the first instance: a dispute over whether the parties entered into any arbitration agreement in the first place." *Id.*[5]

---

[4] The parties submitted post-argument briefs addressing the impact, if any, of the Supreme Court's recent decisions in *Schein*, 139 S. Ct. 524, and *New Prime, Inc. v. Oliveira*, 139 S. Ct. 532 (2019). Neither decision bears on the issues before us. *Schein* simply rejected the "wholly groundless" exception to arbitrability delegations. 139 S. Ct. at 529. It did not change—to the contrary, it reaffirmed—the rule that courts must first decide whether an arbitration agreement exists at all. *See id.* at 530 ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."). Similarly, *Oliveira* decided only that "a court should decide for itself whether [the Federal Arbitration Act's] 'contracts of employment' exclusion applies before ordering arbitration," 139 S. Ct. at 537, but said nothing about how a court should determine whether any arbitration agreement exists to begin with.

[5] Underwriters urge that arbitration is "strongly favored" and should be granted unless the pertinent arbitration clause is "not susceptible of an interpretation" that would cover the dispute. *See, e.g., Sedco, Inc. v. Petroleos Mexicanos Mexican Nat. Oil Co. (Pemex)*, 767 F.2d 1140, 1145 (5th Cir. 1985), *as modified by Freudensprung v. Offshore Tech. Servs.*, Inc., 379 F.3d 327 (5th Cir. 2004). We do not question those principles, but they have no bearing here. We are not interpreting an arbitration clause; we are deciding whether an arbitration clause exists between the relevant parties. The "strong federal policy favoring arbitration," we have held, "'does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'" *Will-Drill*, 352 F.3d at 214 (quoting *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)).

No. 17-20550

For the same reason, Underwriters are wrong that FloaTEC "gamed the system by asking the district court to first determine the merits" and, if that failed, asking "to send the case to mandatory arbitration" for a second bite at the apple. As explained, FloaTEC's motion to dismiss did not ask the court to "determine the merits" of Underwriters' claims; it asked the court to rule that Underwriters could not be subrogated to Chevron's rights. And FloaTEC asked for arbitration *only if* the court ruled that Underwriters *were* subrogated to Chevron's rights. By making these alternative requests, FloaTEC was not "gaming the system"—it was covering its bases. *Cf. Mirant*, 613 F.3d at 590–91 (a party "game[d] the system" when it "did not initially present its motion to compel arbitration . . . as an alternative to its motion to dismiss," but instead litigated the merits extensively before moving to compel arbitration).

In sum, we conclude the district court correctly ruled on FloaTEC's motion to dismiss before addressing any issue concerning the arbitrability of Underwriters' claims.[6]

B.

We turn to Underwriters' argument that the district court erred by dismissing its claims against FloaTEC. The district court reasoned that FloaTEC qualified as an "Other Assured," as defined in the Policy, because FloaTEC "entered into a written contract" with Chevron "in connection with the [Big Foot project]." The court therefore concluded that Underwriters' subrogated claims were barred, because in the Policy Underwriters "agree[d] to waive rights of subrogation against any . . . Other Assured(s)."

---

[6] Given our resolution of this threshold issue, we need not consider FloaTEC's alternative argument that Underwriters waived their right to argue for arbitration now by opposing arbitration below.

11

No. 17-20550

On appeal, Underwriters contend the district court misread the Policy. They focus, not on the definition of "Other Assured," but on a distinct clause entitled "Special Conditions for Other Assureds," which provides as follows (we present the three sentences of the clause separately for easier reading):

> [1] The interest of the Other Assured(s) shall be covered throughout the entire Policy Period for their direct participation in the venture, unless specific contract(s) contain provisions to the contrary.

> [2] The rights of any Assured under this insurance shall only be exercised through the Principal Assureds.

> [3] Where the benefits of this insurance have been passed to an Assured by contract, the benefits passed to that Assured shall be no greater than such contract allows and in no case greater than the benefits provided under the insuring agreements, terms[,] conditions[,] and exclusions in the Policy (brackets added).

The definition of "Other Assured," argue Underwriters, must be read in light of these Special Conditions. Specifically, they say the clause's first and third sentences require consulting the Chevron/FloaTEC Contract to see whether Chevron is obligated to provide insurance coverage to FloaTEC under the Policy. If not, Underwriters argue that FloaTEC cannot qualify as an "Other Assured" and so cannot invoke the Policy's subrogation waiver. Moreover, Underwriters contend that by defining "Other Assured" in isolation, the district court rendered the Special Conditions clause meaningless. They argue that, "[i]f possession of a written contract [with Chevron] alone was sufficient to qualify for full coverage under the [Policy], there would be no need for the Special Conditions provision."

To resolve this issue, we apply Louisiana law[7] governing contract interpretation. *See generally* LA. CIV. CODE, bk. III, tit. IV, ch. 13; *id.* arts.

---

[7] As the district court correctly found, Louisiana law applies under the Outer Continental Shelf Lands Act. *See* 43 U.S.C. § 1333(a). Congress has "adopt[ed] as surrogate

No. 17-20550

2045–2057; *see also, e.g., In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206–08 (5th Cir. 2007) (discussing Louisiana law principles for interpreting insurance contracts). Under Louisiana law, "[t]he role of the judiciary in interpreting insurance contracts is to ascertain the common intent of the insured and insurer as reflected by the words in the policy." *Peterson v. Schimek*, 98-1712 (La. 3/2/99); 729 So. 2d 1024, 1028; *see also* LA. CIV. CODE art. 2045 (contractual interpretation is "the determination of the common intent of the parties"). "Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03); 848 So. 2d 577, 580 (citing LA. CIV. CODE art. 2047). Insurance policies should be construed holistically, meaning that "one policy provision is not to be construed separately at the expense of disregarding other policy provisions." *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-0911 (La. 1/14/94); 630 So. 2d 759, 763; *see also* LA. CIV. CODE art. 2050 (contractual provisions must be interpreted "in light of the other provisions" to give each "the meaning suggested by the contract as a whole"). "The rules of construction do not authorize . . . the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." *Cadwallader*, 848 So. 2d at 580; *see also* LA. CIV. CODE art. 2046 (when words are "clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent"). On the other hand, "[i]f after applying the other general rules of construction an ambiguity remains, the ambiguous contractual

---

federal law the 'civil and criminal laws of each adjacent State'" to govern disputes on the Outer Continental Shelf. *Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 215 (5th Cir.), *order clarified on reh'g*, 829 F.3d 770 (5th Cir. 2016) (quoting 43 U.S.C. § 1333(a)(2)(A)). Parties cannot alter this rule by choosing another state's law in their contract. *Id.*

provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *Louisiana Ins. Guar. Ass'n*, 630 So. 2d at 764; *see also Katrina Canal Breaches Litig.*, 495 F.3d at 207 (same). Under this "rule of strict construction," ambiguous clauses are "construed against the insurer and in favor of coverage" and "equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer." *Bonin v. Westport Ins. Corp.*, 2005-0886 (La. 5/17/06); 930 So.2d 906, 911 (citations omitted).

Applying these principles to the insurance contract at issue, we reject Underwriters' arguments that the district court misread its terms. To the contrary, the court correctly found FloaTEC to be an "Other Assured" under the Policy and thus correctly concluded that Underwriters' claims against FloaTEC are barred by the Policy's subrogation waiver.

First, the "plain . . . meaning" of the Policy qualifies FloaTEC as an "Other Assured." *Cadwallader*, 848 So. 2d at 580. It is uncontested that FloaTEC contracted with Chevron to provide engineering services for Big Foot. This makes FloaTEC an "Other Assured" under the Policy's text because it "entered into [a] written contract[ ]" with Chevron "in connection with the [Big Foot] project." The Policy places no additional conditions on the status of an "Other Assured." *See, e.g., AGIP Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.*, 920 F. Supp. 1318, 1325–26 (S.D. Tex. 1996) (construing materially identical definition of "other assured" and concluding this "clear and unambiguous language . . . [was] intended to include contractors . . . who entered into agreements with [the principal Assured] concerning the [project]"). FloaTEC therefore qualifies under the Policy as an "Other Assured" against whom Underwriters "agree[d] to waive rights of subrogation," as the district court correctly found. No further analysis was required in the face of that plain language. *See* LA. CIV. CODE art. 2046 ("no further interpretation

may be made in search of the parties' intent" when a contract's words are "clear and explicit and lead to no absurd consequences").

Tellingly, Underwriters' arguments are not directed to the text of the "Other Assured" definition or the subrogation waiver. Instead, they rely on cases allegedly standing for the proposition that an "Other Assured" must be entitled to insurance coverage from a Principal Assured. *See, e.g., WH Holdings, LLC v. Ace Am. Ins. Co.*, 481 F. App'x 894 (5th Cir. 2012); *Edwards v. Brambles Equip. Servs., Inc.*, 75 F. App'x 929 (5th Cir. 2003). But "[n]one of th[ose] cases," the district court cogently observed, "supports a general proposition that, always and everywhere, Other Assured status is determined by reference to the contract between a Principal Assured and a putative Other Assured." To the contrary, in those cases the issue turned—as it does here—on the specific policy definition in play.

The policies in Underwriters' cases limit an "insured" to entities a principal is obligated to insure. *See WH Holdings*, 481 F. App'x at 895 (defining "insured" to include "any party in interest *which the insured is responsible to insure*"); *Edwards*, 75 F. App'x at 932 (involving a policy that "extend[ed] coverage to 'any person or organization you [the main policyholder] are *required by written contract to include as an insured*'") (emphases added). Here, the pertinent definition is materially different: "Other Assured" means an entity with whom a principal Assured has "entered into written contract(s) in connection with the [Big Foot] Project." That definition does not require that the principal Assured *also* be obligated to provide coverage to the entity, and we cannot blue-pencil that extra clause into the Contract. "[I]t is too obvious for argument that courts will not add words to a contract for the purpose of ascertaining the true intent of the parties." *Ross v. Zuntz*, 36 La. Ann. 888, 894 (La. 1884); *see also Sims v. Mulhearn Funeral Home, Inc.*, 2007-0054 (La. 5/22/07); 956 So. 2d 583, 589 (explaining "[c]ourts lack the authority to alter

the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms").

Second, we disagree with Underwriters that the Special Conditions clause somehow alters or qualifies the Policy's otherwise unambiguous definition of "Other Assured." Nothing in the Special Conditions clause purports to modify that definition. To the contrary, the clause assumes that its conditions apply only to entities that already *are* "Other Assureds." Nor does the clause purport to modify the Policy's subrogation waiver, which unambiguously "waive[s] rights of subrogation against . . . Other Assured[s]." Reading the Special Conditions clause to strip an otherwise-qualified entity of "Other Assured" status, as Underwriters urge us to do, would be an impermissible "exercise of inventive powers to create an ambiguity where none exists." *Cadwallader*, 848 So. 2d at 580. We lack authority to do that. *See* LA. CIV. CODE art. 2046; *Sims*, 956 So. 2d at 589.

Even if we possessed that revisionary authority—and could pretend the Special Conditions clause somehow modifies the definition of "Other Assured"—that would not help Underwriters. We would then be left with an insurance contract ambiguous on what constitutes an "Other Assured," and ambiguous on how the subrogation waiver applies. But it is bedrock law that ambiguous insurance provisions are read *against* the insurer and in favor of coverage. *LeBlanc v. Aysenne*, 2005-0297 (La. 1/19/06); 921 So.2d 85, 89 (explaining "[i]f there is an ambiguity in a[n] [insurance] policy, then that ambiguity should be construed in favor of the insured and against the insurer") (citing *Pareti v. Sentry Indemnity Co.*, 536 So.2d 417, 420 (La. 1988); *accord Bonin*, 930 So.2d at 911; *Carrier v. Reliance Ins. Co.*, 1999-2573 (La. 4/11/00); 759 So. 2d 37, 43; *Louisiana Ins. Guar. Ass'n*, 630 So. 2d at 764. Moreover, when "subrogation is disputed," then the intent to subrogate "must be shown by clear proof . . . that unquestionably implies it." *A. Copeland Enter., Inc. v.*

No. 17-20550

*Slidell Mem'l Hosp.*, 94-2011 (La. 6/30/95); 657 So.2d 1292, 1298 (citing 5 LA. CIV. L. TREATISE, LAW OF OBLIGATIONS § 11.22 (1992)). Far from "clear proof" of an intent to subrogate, here the Policy's plain text shows intent to *bar* subrogation against a putative "Other Assured" like FloaTEC and does not even hint that the Special Conditions clause tempers that bar.

If there were any doubt on this point, the record shows that Underwriters and Chevron knew exactly how to limit "Other Assured" status in the Policy. The parties struck through a provision in the Special Conditions section that made conformity with certain "Quality Assurance/Quality Control system(s)" a "*condition precedent . . . to benefit from the Other Assureds status*" (emphasis added).[8] If Underwriters and Chevron wanted to impose a similar condition precedent for required Policy coverage (or anything else), a template was thus readily available: The parties could have inserted a provision making Chevron's obligation to extend Policy coverage a "condition precedent" to an entity's ability to benefit from "Other Assured" status or from the subrogation waiver. They did not, and we cannot do it for them.

We also reject Underwriters' argument that allowing FloaTEC to benefit from the subrogation waiver as an "Other Assured" renders the Special Conditions clause "meaningless." To be sure, we must read an insurance

---

[8] The stricken clause appears in the record as follows:

It is a condition precedent for any party identified in Other Assureds definition clause iii. and iv. above to benefit from the Other Assureds status under the Policy that they perform their operations according to Quality Assurance/Quality Control system(s) which comply with the Quality Assurance/Quality Control provisions passed on by the Principal Assureds through each and every written contract awarded within the scope of insured works as scheduled under the Policy.

*See, e.g.,* Taylor, *supra*, at 1181 (explaining that this provision, which was "designed to limit access to the policy for contractors" who failed to comply with agreed quality control procedures, "has not been a popular clause and is now frequently deleted"). The parties also struck a similar clause from the Policy's subrogation waiver. That clause would have made conformity with the same quality control provisions a "condition precedent to [Other Assureds] benefiting from the [Policy's] automatic waiver of subrogation."

contract to give every provision meaning. LA. CIV. CODE art. 2050; *see, e.g., Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228, 231 (5th Cir. 2007) (under Louisiana law, "[a]n insurance contract is to be construed as a whole"). But, even on the district court's straightforward reading of "Other Assured" (requiring an "Other Assured" only to have a Big Foot contract with Chevron), the Special Conditions clause would still play a role in the parties' contractual relationships. For instance, the first sentence of the Special Conditions clause permits Chevron to limit a contractor's Policy coverage through a "provision" in a "specific contract." Suppose Chevron did that in its contract with FloaTEC (as appears to be the case)[9]: That limitation might come into play should *FloaTEC* seek affirmative recovery under the Policy *against Underwriters* (which, of course, is not the scenario we have here). The second Special Conditions sentence would also play a role in this scenario: FloaTEC would have to "exercise[ ]" whatever "rights" it has under the Policy "through the Principal Assureds," like Chevron. And the third Special Conditions sentence would insure that any recovery FloaTEC sought under the Policy "shall be no greater than such contract [with Chevron] allows."

This reading harmonizes the "Other Assured" definition and the Special Conditions clause. The definition concerns a party's *status* as an "Other Assured," whereas the clause concerns the *extent* to which an "Other Assured"

---

[9] As the district court explained, the Chevron/FloaTEC Contract requires FloaTEC to maintain specific insurance covering certain project risks, such as workers' compensation and employer's liability insurance, commercial general liability insurance, and automobile, watercraft, and aircraft insurance. The Contract further provides that, to the extent of FloaTEC's liabilities, this required insurance "is primary with respect to all insureds . . . and that no other insurance carried by [Chevron] will be considered as contributory insurance for any loss." We need not decide to what extent these provisions limit FloaTEC's interests under the Policy because, as explained, FloaTEC is not seeking recovery under the Policy. Rather, it is seeking only to raise the subrogation waiver against Underwriters' claims. It is enough to say, with the district court, that these insurance requirements in the Chevron/FloaTEC Contract "have nothing to do with [FloaTEC's] Other Assured status" under the Policy.

may claim Policy coverage. By arguing that a party has "Other Assured" status only insofar as it has coverage, Underwriters conflate status and extent of coverage. But the Policy does not. As the district court cogently explained, "the Policy definition of an Other Assured . . . plainly does not require the contract between [Chevron] and [FloaTEC] to address the subject of insurance[.]" Moreover, under the rules of contract interpretation, we should avoid an interpretation of the Special Conditions clause that overrides the plain language of the "Other Assured" definition. *See, e.g., Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 2012-2055 (La. 3/19/13); 112 So.3d 187, 195 (courts should "interpret contract provisions 'so as to avoid neutralizing or ignoring any of them or treating them as surplusage'") (quoting *John Bailey Contractor, Inc. v. State Dept. of Transp. & Devel.*, 439 So.2d 1055, 1058 (La. 1983)) (citing La. Civ. Code art. 2050).

Finally, another reason for rejecting Underwriters' counter-textual reading of the Policy (and for accepting the district court's textual reading) is that Underwriters' reading collides with the "anti-subrogation" rule. Under this "fundamental principle of insurance law[,]" "[a]n insurer cannot by way of subrogation recover against its insured *or an additional assured* any part of its payment for a risk covered by the policy." *Peavey v. M/V ANPA*, 971 F.2d 1168, 1177 (5th Cir. 1992) (citing, *inter alia, Dow Chemical Co. v. M/V Roberta Taylor*, 815 F.2d 1037, 1043 (5th Cir. 1987)) (emphasis added).[10] Importantly, the rule applies even when the additional assured is not covered under the

---

[10] *See also, e.g., Shelter Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 2007-0163 (La. App. 1 Cir. 7/18/08); 993 So.2d 236, 240 (observing "[i]t is well settled [under Louisiana law] that an insurer cannot be subrogated against its own insured") (citations omitted); 16 Couch on Ins. § 224:12 ("Pursuant to the antisubrogation rule, an insurer is not entitled to subrogation against persons or entities named in the policy as insureds, *or who are additional insureds under the terms of the policy*.") (citing, *inter alia, Olinkraft, Inc. v. Anco Insulation, Inc.*, 376 So.2d 1301 (La. App. 2 Cir. 1979) (emphasis added).

policy for the specific risk at issue. *See, e.g., Dow Chemical Co.*, 815 F.2d at 1044–45 (discussing *Marathon Oil Co. v. Mid-Continent Underwriters*, 786 F.2d 1301, 1302 (5th Cir. 1986); *Wiley v. Offshore Painting Contractors, Inc.*, 711 F.2d 602 (5th Cir.), *on reh'g*, 716 F.2d 256 (5th Cir. 1983)). Our key decision is *Marathon Oil*, in which Judge Rubin explained:

> [W]hen underwriters issue a policy covering an additional assured and waiving 'all subrogation' rights against it, they cannot recoup from the additional assured any portion of the sums they have paid to settle a risk covered by the policy, *even on the theory that the recoupment is based on the additional assured's exposure for risks not covered by the policy*.

786 F.2d at 1302 (emphasis added); *see also AGIP*, 920 F. Supp. at 1329 (*Marathon Oil* "determined . . . that waiver of subrogation is not co-extensive with, but is broader than, coverage under the insurance policy"); *and see, e.g., Lanasse v. Travelers Ins. Co.*, 450 F.2d 580 (5th Cir. 1971) (op. of Brown, C.J.) (underwriters could not recover against additional assured "in the face of the explicit policy provision waiving subrogation" even though the "additional assured . . . cannot claim the affirmative benefit of the [policy] coverage").

Underwriters' awkward yoking of "Other Assured" status to the Special Conditions clause would bring their suit perilously close to the anti-subrogation danger zone. Recall Underwriters' theory: Despite the Policy definition, they say FloaTEC is not an "Other Assured" (and thus can be sued via subrogation) solely because the Contract withholds full Policy coverage from FloaTEC. This is precisely the forbidden scenario laid out in Judge Rubin's *Marathon Oil* opinion: (1) Underwriters would "recoup from [an] additional assured [*i.e.*, FloaTEC] sums they have paid to settle a risk covered by the policy"; (2) the Policy "waiv[es] . . . subrogation" against an "additional assured"; and (3) Underwriters rely "on the theory that the recoupment is based on [FloaTEC's] exposure for risks not covered by the [P]olicy." *Marathon*

*Oil*, 786 F.2d at 1302 (brackets added). Thus FloaTEC, understandably, urges us to rule that the anti-subrogation principle bars Underwriters' suit as a matter of public policy. *See, e.g.*, *Peavey*, 971 F.2d at 1177 (describing anti-subrogation rule as based on "public policy"). But we need not go that far. It is enough to say that avoiding conflict with the anti-subrogation rule provides yet another reason—over and above the textual and contextual reasons already discussed—to give the Policy definition of "Other Assured" the straightforward reading the district court did. *See, e.g., In re Katrina Canal Breaches Litig.*, 2010-1823 (La. 5/10/11); 63 So.3d 955, 963 (assessing whether certain insurance provisions "violate public policy"); *Peterson*, 729 So.2d at 1031 (explaining that insurance contracts should be construed to "give[ ] effect to the long-standing public policy of this State").

## IV.

To sum up, we conclude that the district court properly ruled on FloaTEC's motion to dismiss Underwriters' claims before considering arbitrability. We also conclude that the district court correctly found FloaTEC was an "Other Assured" under the Policy and could thus invoke the subrogation waiver. We therefore affirm the district court's judgment dismissing Underwriters' claims with prejudice.

AFFIRMED.