**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 19-2058, 19-2082
_____

CHRISTINA WILLIAMS; MICHAEL STERMEL,
On Behalf of Themselves and All Others Similarly Situated

v.

MEDLEY OPPORTUNITY FUND II, LP;
MARK CURRY; BRIAN MCGOWAN; VINCENT NEY;
OTHER JOHN DOE PERSONS OR ENTITIES;
RED STONE INC, As Successor In Interest to MacFarlane
Group, Inc.

Red Stone, Inc.

Appellant in
No. 19-2058

_____

CHRISTINA WILLIAMS; MICHAEL STERMEL, On
Behalf of
Themselves and All Others Similarly Situated

v.

MEDLEY OPPORTUNITY FUND II, LP; MARK CURRY;

BRIAN MCGOWAN; VINCENT NEY; OTHER JOHN DOE
PERSONS OR ENTITIES; RED STONE, INC., As Successor
In Interest to MacFarlane Group, Inc.

Mark Curry, Brian McGowan, Vincent Ney,

Appellants in
No. 19-2082

_____

Appeals from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-18-cv-02747)
District Judge: Honorable Mitchell S. Goldberg

_____

Argued February 5, 2020

_____

Before: SHWARTZ, SCIRICA, and COWEN, <u>Circuit Judges</u>.

(Filed: July 14, 2020)

_____

Arpit K. Garg
Tamara S. Grimm
Molly M. Jennings
Jonathan E. Paikin
Thomas L. Strickland
Daniel Volchok [ARGUED]
Seth P. Waxman
WilmerHale

1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

Charles K. Seyfarth
O'Hagan Meyer
411 East Franklin Street
Suite 500
Richmond, VA 23219

     *Counsel for Appellant Red Stone, Inc.*

Robert M. Cary
Sarah M. Harris [ARGUED]
Michael J. Mestitz
Christopher Yeager
Williams & Connolly
725 12th Street, N.W.
Washington, DC 20005

     *Counsel for Appellant Mark Curry*

David F. Herman
Richard L. Scheff
Armstrong Teasdale
One Commerce Square, 2005 Market Street
29th Floor
Philadelphia, PA 19103

     *Counsel for Appellants Brian McGowan and Vincent Ney*

Michael J. Quirk
Motley Rice

40 West Evergreen Avenue
Suite 104
Philadelphia, PA 19118

Matthew W.H. Wessler [ARGUED]
Gupta Wessler
1900 L Street, N.W.
Suite 312
Washington, DC 20036

>*Counsel for Appellees Christina Williams and Michael Stermel, On Behalf of Themselves and All Others Similarly Situated*

Stephen F. Raiola
Covington & Burling
850 10th Street, N.W.
One City Center
Washington, DC 20001

>*Counsel for Amicus Curiae Online Lenders Alliance in Support of Appellants*

Patrick O. Daugherty
Van Ness Feldman
1050 Thomas Jefferson Street, N.W.
Seventh Floor
Washington, DC 20007

>*Counsel for Amicus Curiae Native American Financial Services Association in Support of Appellants*

Anthony M. Sabino

2nd Floor
92 Willis Avenue
Mineola, NY 11501

   *Counsel for Amicus Curiae Anthony Michael Sabino in
   Support of Appellant Red Stone, Inc.*

Mark C. Stephenson
Ward Law
1617 John F. Kennedy Boulevard
Suite 500
Philadelphia, PA 19103

   *Counsel for Amici Curiae American Legislative
   Exchange Council, The Center for Individual
   Freedom, and the American Consumer Institute in
   Support of Appellant Red Stone, Inc.*

Jeffrey R. White
American Association for Justice
777 6th Street, N.W.
Suite 200
Washington, DC 20001

   *Counsel for Amicus Curiae American Association for
   Justice in Support of Appellees*

_____

OPINION
_____

SHWARTZ, Circuit Judge.

Christina Williams and Michael Stermel ("Plaintiffs") obtained loans from AWL, Inc., an online entity owned by the Otoe-Missouria Tribe of Indians ("Tribe"). Plaintiffs assert that AWL charged unlawfully high interest rates and sued AWL's holding company, Red Stone, Inc., and three members of AWL's board of directors, Mark Curry, Vincent Ney, and Brian McGowan (collectively, "Defendants") for violations of federal and Pennsylvania law. Defendants moved to compel arbitration. The District Court denied their motion, holding that the loan agreements—which provided that only tribal law would apply in arbitration—stripped Plaintiffs of their right to assert statutory claims and were therefore unenforceable. Because AWL permits borrowers to raise disputes in arbitration only under tribal law, and such a limitation constitutes a prospective waiver of statutory rights, its arbitration agreement violates public policy and is therefore unenforceable. As a result, the District Court correctly denied Defendants' motion to compel arbitration.

I[1]

A

Plaintiffs entered into payday loan agreements with

___

[1] Because Defendants moved to compel arbitration based on the face of the complaint and the documents relied upon, and because the District Court did not order discovery and instead relied only on the pleadings, we draw the facts from Plaintiffs' complaint. See Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 772, 776 (3d Cir. 2013).

AWL.  "Payday loans are ostensibly short-term cash advances for people who face unexpected obligations or emergencies," "typically for small sums" and "to be repaid quickly."  Gingras v. Think Fin., Inc., 922 F.3d 112, 117 (2d Cir. 2019), cert. denied, 140 S. Ct. 856 (2020).

To obtain loans from AWL, Plaintiffs had to sign a loan agreement that set forth the interest rates, payment terms, and other provisions.[2]  The loan agreement states that it "is between you, as borrower/debtor, and AWL, Inc., an arm of [the Tribe], as lender," J.A. 280, and includes the following "IMPORTANT DISCLOSURE" to the borrower:

> YOU AGREE THAT THIS LOAN IS MADE WITHIN THE TRIBE'S JURISDICTION AND IS SUBJECT TO AND GOVERNED BY TRIBAL LAW[3] AND NOT THE LAW OF YOUR RESIDENT STATE.  IN MAKING THIS LOAN, YOU CONSENT TO TRIBAL JURISDICTION FOR THIS LOAN.  YOUR RESIDENT STATE LAW MAY HAVE INTEREST RATE LIMITS AND OTHER CONSUMER PROTECTION PROVISIONS THAT ARE MORE FAVORABLE.  IF YOU

---

[2] The three loan agreements at issue in this case (two by Williams and one by Stermel) are identical, save the principal, which ranged from $1000-$1600, and annual percentage interest rates, which ranged from 496.55% to 714.88%, J.A. 35-37, so we will refer to the three agreements as one.

[3] The loan agreement defines "Tribal Law" as "any law or regulation duly enacted by the [Otoe-Missouria] Tribe." J.A. 280.

WISH TO HAVE YOUR RESIDENT STATE
LAW APPLY TO ANY LOAN THAT YOU
TAKE OUT, YOU SHOULD CONSIDER
TAKING A LOAN FROM A LICENSED
LENDER IN YOUR STATE.

J.A. 280 (capitalization in original).[4] The loan agreement also makes disclosures pursuant to the Truth in Lending Act, but states that "we do not concede that the Truth in Lending Act applies to this transaction." J.A. 283. The loan agreement further informs the borrower that "[o]ur inclusion of any disclosures does not mean that Lender consents to the application of federal law to any Loan or to this [Loan] Agreement." J.A. 281.

Following these disclosures, the loan agreement contains twenty-five numbered sections. One section is titled "WAIVER OF JURY TRIAL AND AGREEMENT TO ARBITRATE." J.A. 289 (capitalization in original). This section of the loan agreement is defined in the contract as "the Agreement to Arbitrate." Compare J.A. 289 (defining the "Waiver of Jury Trial and Agreement to Arbitrate" as the "Agreement to Arbitrate"), with J.A. 280 (defining "this loan agreement" as the "Agreement" (capitalization omitted)). We refer to this section as the "arbitration agreement."

---

[4] The disclosure also provides that the lender is immune from suit in any court, the lender is regulated only by the Tribe's Consumer Finance Services Regulatory Commission, and a borrower's right to submit complaints is limited to the dispute resolution process set forth in the loan agreement or to the Commission.

The arbitration agreement: (1) provides that "any dispute you have related to this agreement will be resolved by binding arbitration," J.A. 289 (capitalization omitted); (2) defines "[d]ispute" as "any claim or controversy of any kind between you and us or otherwise involving this [Loan] Agreement or the Loan . . . includ[ing], without limitation, all federal, state or Tribal Law claims or demands" and "any issue concerning the validity, enforceability, or scope of this [Loan] Agreement" or arbitration agreement, J.A. 289-90; and (3) allows the party requesting arbitration to select either the American Arbitration Association ("AAA") or JAMS "for initiating and pursuing arbitration," J.A. 290.

In a subsection called "APPLICABLE LAW AND JUDICIAL REVIEW OF ARBITRATOR'S AWARD," the arbitration agreement states: "THIS [LOAN] AGREEMENT SHALL BE GOVERNED BY TRIBAL LAW." J.A. 291 (capitalization in original). The subsection then specifies that "[t]he arbitrator shall apply Tribal Law and the terms of this [Loan] Agreement, including [the arbitration agreement]." J.A. 291. The subsection further provides that

> [t]he arbitrator shall make written findings and the arbitrator's award may be filed with a Tribal court. The arbitration award shall be supported by substantial evidence and must be consistent with this [Loan] Agreement and Tribal Law, and if it is not, it may be set aside by a Tribal court upon judicial review.

J.A. 291. The tribal court may confirm an arbitration award "only if" the court "determines that the award is supported by substantial evidence and is not based on legal error under

9

Tribal Law." J.A. 291.

The arbitration agreement makes numerous other references to tribal law:

- "The policies and procedures of the selected arbitration firm applicable to consumer transactions will apply provided such policies and procedures do not contradict this [arbitration agreement] or Tribal Law." J.A. 290.

- "Unless prohibited by Tribal Law, the arbitrator may award fees, costs, and reasonable attorneys' fees to you if you substantially prevail in the arbitration." J.A. 290.

- "Any arbitration under this [Loan] Agreement may be conducted either on Tribal land or within thirty (30) miles of your then current residence, at your choice, provided that this accommodation for you shall not be construed in any way . . . to allow for the application of any law other than Tribal Law . . . ." J.A. 291.

- "The arbitrator has the ability to award all remedies available under Tribal Law . . . ." J.A. 291.

- "As an integral component of accepting this [Loan] Agreement, you irrevocably consent to the exclusive jurisdiction of the Tribal courts for purposes of this [Loan] Agreement." J.A. 291.

- "In the event you opt out of the [arbitration agreement], any disputes shall nonetheless be governed under tribal law and must be brought within the court system of [the Tribe]." J.A. 289 (capitalization omitted).

10

Separate from the arbitration agreement is another section of the loan agreement, titled "ACKNOWLEDGEMENT AND CERTIFICATION." J.A. 292 (capitalization in original). That section also discusses both arbitration and tribal law and notifies the borrower that "[b]y signing below, you also consent to the dispute resolution provision including the provision consenting and limiting disputes to tribal law and to tribal courts, to arbitration and to the provision not to bring, join or participate in any class action." J.A. 292.

Another section of the loan agreement, titled "GOVERNING LAW," mentions federal law and its application to the loan agreement and the Tribe. J.A. 292 (capitalization in original). It provides, in relevant part:

> You understand and agree that this [Loan] Agreement is governed only by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the United States Constitution . . . . [N]either we nor this [Loan] Agreement are subject to any other federal or state law or regulation, nor to the jurisdiction of any court, unless so stated in this [Loan] Agreement . . . . The Lender may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the Tribe to any federal law unless found expressly applicable to the operations of the Tribe.

J.A. 292.

11

The loan agreement also includes a severability clause that provides: "If any provision of this [Loan] Agreement is held unenforceable, including any provision of the [arbitration agreement], the remainder of this [Loan] Agreement shall remain in full force and effect."  J.A. 292.

B

Plaintiffs, on behalf of themselves and a putative class, sued Defendants in federal court, alleging that AWL's lending practices violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and various Pennsylvania consumer protection laws.  Defendants moved to compel arbitration.

The District Court denied the motion to compel, reasoning that: (1) the arbitration agreement was unenforceable because the arbitrator is permitted only to consider tribal law and, therefore, the arbitrator could not consider any of Plaintiffs' claims as they are based on federal and state law; and (2) "a 'choice of arbitrator' provision permitting the parties to select the AAA or JAMS does not provide an available arbitral forum" because it only permitted the arbitrator to apply policies and procedures that do not "contradict the agreement or 'Tribal law,'" J.A. 5 (quoting MacDonald v. CashCall, Inc., 883 F.3d 220, 229-30 (3d Cir. 2018)).

Defendants appeal.

## II[5]

"The Federal Arbitration Act requires courts to enforce covered arbitration agreements according to their terms." Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1412 (2019) (citing 9 U.S.C. § 2).[6] Defendants assert that the District Court erred in refusing to compel arbitration because (A) the arbitration agreement specifies that the arbitrator will decide issues of enforceability and (B) the arbitration agreement's applicable law subsection is not an impermissible prospective waiver of statutory rights.

### A

We first address who decides whether the arbitration agreement is enforceable: the court or the arbitrator. The

---

[5] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). We have jurisdiction over appeals from orders denying a motion to compel arbitration. 9 U.S.C. § 16(a)(1)(B); In re Remicade (Direct Purchaser) Antitrust Litig., 938 F.3d 515, 519 n.3 (3d Cir. 2019). Our review of such orders is plenary, and "we may affirm on any grounds supported by the record." MacDonald, 883 F.3d at 225 (quoting Hassen v. Gov't of V.I., 861 F.3d 108, 114 (3d Cir. 2017)).

[6] 9 U.S.C. § 2 provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

13

arbitration agreement provides that "any dispute . . . related to this agreement will be resolved by binding arbitration," J.A. 289 (capitalization omitted), "includ[ing] any issue concerning the . . . enforceability . . . of this [Loan] Agreement" or the arbitration agreement, J.A. 290. Defendants argue that a court cannot decide whether the arbitration agreement is unenforceable because the agreement delegates such enforceability determinations to the arbitrator.

"[P]arties may agree to have an arbitrator decide not only the merits of a particular dispute but also . . . 'whether the parties have agreed to arbitrate,'" in what is called a "delegation clause." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019) (quoting Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 68-69 (2010)). The Supreme Court explained that "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." Id. at 530 (citation omitted). In accordance with this principle, our Court has held that when an agreement contains a clause that delegates to an arbitrator the decision whether an arbitration agreement is enforceable, "[a] court cannot reach the question of the arbitration agreement's enforceability unless a party challenged the delegation clause and the court concludes that the delegation clause is not enforceable." MacDonald, 883 F.3d at 226. While a party "must 'challenge the delegation provision specifically,'" id. (quoting Rent-A-Center, 561 U.S. at 70, 72) (alteration omitted), "a party may rely on the same arguments that it

14

employs to contest the enforceability of other arbitration agreement provisions," id. at 226-27.[7]

Plaintiffs contested the delegation clause in their opposition to the motion to compel, and they challenged the clause based upon arguments they made concerning the enforceability of the entire arbitration agreement. Pls.' Opp'n to Mot. to Compel at 15, ECF No. 100 ("A contract that contains an FAA-prohibited prospective waiver is unenforceable in its entirety, delegation clause included . . . . As a result, any delegation clause here is unenforceable for the same reason the rest of the arbitration contract is unenforceable."). Because "[t]hese explicit references to the delegation clause are sufficient to contest it," MacDonald, 883 F.3d at 227, we will proceed to examine Plaintiffs' enforceability arguments.

---

[7] Defendants contend that Henry Schein establishes a categorical rule that, when an agreement includes a delegation clause, "a court possesses no power to decide the arbitrability issue." Curry Br. at 24 (quoting Henry Schein, 139 S. Ct. at 529). Several appellate courts have rejected similar arguments, Gingras, 922 F.3d at 126 n.3; Lloyd's Syndicate 457 v. FloaTEC, L.L.C., 921 F.3d 508, 515 n.4 (5th Cir. 2019), and we agree with them. The question presented in Henry Schein was limited to whether courts, even in the face of a delegation clause, may "decide the arbitrability question themselves if the argument that the arbitration agreement applies to the particular dispute is 'wholly groundless.'" 139 S. Ct. at 527-28. Henry Schein "did not change . . . the rule that courts must first decide whether an arbitration agreement exists at all." Lloyd's, 921 F.3d at 515 n.4; see also Gingras, 922 F.3d at 126 n.3 (stating that Henry Schein did not address "a challenge to the validity of an arbitration clause itself").

15

B

Plaintiffs contend that the arbitration agreement, including the delegation clause, is unenforceable under the prospective waiver doctrine. The prospective waiver doctrine in the arbitration context refers to a situation in which the parties agree that, if disputes arise between them, then they waive the right to rely on federal law. The Supreme Court has observed that such waivers violate public policy. E.g., Am. Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 236 (2013). Thus, while federal policy favors arbitration, "the Supreme Court has . . . made clear that arbitration is only appropriate so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum." Blair v. Scott Specialty Gases, 283 F.3d 595, 605 (3d Cir. 2002) (internal quotation marks, alterations, and citations omitted). Put differently, while arbitration may be a forum to resolve disputes, 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 266 (2009), an agreement to resolve disputes in that forum will be enforced only when a litigant can pursue his statutory rights there, Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985). Accordingly, arbitration agreements that limit a party's substantive claims to those under tribal law, and hence forbid federal claims from being brought, are unenforceable. Gingras, 922 F.3d at 117-18; Dillon v. BMO Harris Bank, N.A., 856 F.3d 330, 332 (4th Cir. 2017); Hayes v. Delbert Servs. Corp., 811 F.3d 666, 668 (4th Cir. 2016); Smith v. W. Sky Fin., LLC, 168 F. Supp. 3d 778, 785 (E.D. Pa. 2016).[8]

_____

[8] Our Court addressed a similar contract in MacDonald that provided that "[t]he arbitrator will apply the laws of the

16

To determine whether the prospective waiver doctrine applies, we must identify the law that would apply in arbitration under the agreement here, and thus what claims Plaintiffs could pursue in arbitration. To do so, we interpret the contract. We apply the forum's contract interpretation law, DIRECTV, Inc. v. Imburgia, 136 S. Ct. 463, 468 (2015), unless the contract has a choice-of-law provision, see Gay v. CreditInform, 511 F.3d 369, 389-90 (3d Cir. 2007). Here, the applicable law subsection of the arbitration agreement states that tribal law applies, and the governing law section of the loan agreement states that "this [Loan] Agreement is governed only by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the United States Constitution." J.A. 292. However, because "the parties have not provided the Court with any such [tribal] law" nor have they identified any "such federal law as is applicable under the Indian Commerce Clause" regarding contract interpretation, we will "apply the forum's contract interpretation principles." MacDonald, 883 F.3d at 228.

a

---

Cheyenne River Sioux Tribal Nation." 883 F.3d at 225. While we held that contract was unenforceable because the arbitral forum there was illusory, id. at 232, and it was therefore unnecessary to reach the prospective waiver issue, one panel member noted that he "would also affirm on the alternative ground that the Loan Agreement impermissibly waives a borrower's federal and state statutory rights, thereby rendering the arbitration clause unenforceable," id. at 233 n.15 (citing Hayes, 811 F.3d at 673-74).

Under the law of the forum, Pennsylvania, we determine the meaning of a contract based on the language used.[9] E.g., Binswanger of Pa., Inc. v. TSG Real Estate LLC, 217 A.3d 256, 262 (Pa. 2019). The applicable law subsection of the arbitration agreement provides that "[t]he arbitrator shall apply Tribal Law and the terms of this [Loan] Agreement, including [the arbitration agreement]." J.A. 291. That subsection further provides that a tribal court may confirm an arbitration award "only if" the court "determines that the award . . . is not based on legal error under Tribal Law." J.A. 291. This subsection thus makes clear that tribal law applies in arbitration and that the arbitrator's decision will only be sustained if it is supported by tribal law.

Other language in the arbitration agreement also demonstrates that the rule of decision in arbitration is tribal law. The arbitration agreement provides that (1) "[t]he arbitrator has the ability to award all remedies available under Tribal Law," J.A. 291; (2) "the arbitrator may award fees, costs, and reasonable attorneys' fees" "[u]nless prohibited by Tribal Law," J.A. 290; (3) if the parties conduct the arbitration off tribal land, the lender's "accommodation" of that request "shall not be construed . . . to allow for the application of any law other than Tribal Law," J.A. 291; and (4) the arbitration firm can only apply "policies and procedures" that "do not contradict . . . Tribal Law," J.A. 290.

---

[9] Because there is no suggestion that Pennsylvania law places arbitration agreements on different "footing" than other contracts, use of Pennsylvania law is consistent with the FAA. DIRECTV, 136 S. Ct. at 468.

18

Finally, and significantly, the acknowledgment and certification section of the loan agreement confirms that the only claims available in arbitration are tribal-law claims, explicitly stating that the borrower "consent[s] to the dispute resolution provision including the provision consenting and limiting disputes to tribal law and to tribal courts, [and] to arbitration." J.A. 292. Thus, the plain language of the arbitration agreement and the loan agreement shows that only tribal-law claims may be brought in arbitration.

b

Defendants, nonetheless, contend that borrowers may bring claims in arbitration that arise under "such federal law as is applicable under the Indian Commerce Clause." To make this argument, Defendants interpret the arbitration agreement's applicable law subsection to incorporate the term "such federal law as is applicable under the Indian Commerce Clause" from the governing law section because the applicable law subsection states that "[t]he arbitrator shall apply Tribal Law and the terms of this [Loan] Agreement," and the governing law section is a term of the loan agreement. We disagree with Defendants' interpretation for two reasons.

First, "the specific controls the general when interpreting a contract." Dominic's Inc. v. Tony's Famous Tomato Pie Bar & Rest., Inc., 214 A.3d 259, 269 (Pa. Super. Ct. 2019) (citation omitted). Because the arbitration agreement specifically directs that tribal law applies in arbitration, with no mention of any other body of law, and because the Indian Commerce Clause language comes from a separate section in the general loan agreement, the arbitration agreement's applicable law subsection is "more likely to reflect the intent

19

of the parties." Trinity Indus., Inc. v. Greenlease Holding Co., 903 F.3d 333, 350 (3d Cir. 2018) (quoting Musko v. Musko, 697 A.2d 255, 256 (Pa. 1997)). This intent to limit a borrower with a dispute to tribal-law claims is apparent in the acknowledgement and certification section, which specifically states that "[b]y signing [the loan agreement], [the borrower] consent[s] to . . . limiting disputes to tribal law." J.A. 292. This specific reference to the type of disputes that a borrower can bring in arbitration controls over the more general reference in the governing law section of the loan agreement.

Second, if we read the phrase "such federal law as is applicable under the Indian Commerce Clause" in the context in which it appears, it becomes clear that that phrase does not provide a separate rule of decision for arbitration. Khawaja v. RE/MAX Cent., 151 A.3d 626, 632 (Pa. Super. Ct. 2016) (instructing that we consider the context in which a contractual phrase appears). The phrase appears in a section separate from the arbitration agreement, titled "GOVERNING LAW." J.A. 292 (capitalization in original). That section further states that "neither we nor this [Loan] Agreement are subject to any other federal or state law or regulation," meaning that the lender and loan agreement are subject only to tribal law and some limited group of unidentified "federal law as is applicable under the Indian Commerce Clause." J.A. 292. Read in its entirety, the governing law section, therefore, identifies only the laws to which the Tribe and loan agreement are subject. The laws to which the Tribe and loan agreement are subject, however, are not the same as what laws can serve as the basis for claims in arbitration.[10]

---

[10] Reading the agreement in any other way would introduce an irreconcilable and nullifying conflict within the contract, which we must avoid. Dominic's, 214 A.3d at 269

20

The agreement itself reflects this difference. The acknowledgement and certification section of the loan agreement, which follows the governing law section, specifically states that "[b]y signing below, you also consent to the dispute resolution provision including the provision consenting and limiting disputes to tribal law and to tribal courts, [and] to arbitration[.]" J.A. 292. Thus, regardless of

---

(stating that "clauses in a contract should not be read as independent agreements thrown together without consideration of their combined effects" so "[t]erms in one section of the contract . . . should never be interpreted in a manner which nullifies other terms" (citation omitted)); see Binswanger, 217 A.3d at 262 (instructing that contracts are not to be interpreted "in such a way as to lead to an absurdity or make the . . . contract ineffective to accomplish its purpose" (citation omitted)). The arbitration agreement provides that "THIS [LOAN] AGREEMENT SHALL BE GOVERNED BY TRIBAL LAW," only tribal-law remedies are available, and the arbitrator's conclusions of law must be consistent with tribal law. J.A. 291 (capitalization in original). If the arbitration agreement's applicable law subsection implicitly incorporates the language from the separate governing law section stating that "such federal law as is applicable under the Indian Commerce Clause," then that could nullify the repeated and explicit directive that only tribal law applies in arbitration and the requirement that a borrower consents to "limiting disputes to tribal law." J.A. 292. Thus, we will not interpret the arbitration agreement's directive to consider the loan agreement as surreptitiously adopting a separate body of law, in contravention to the plain language of the arbitration agreement.

the law captured by the governing law section, a borrower is limited to pursuing disputes under tribal law.

2

Because the arbitration agreement mandates that only tribal law applies in arbitration, federal law does not. As a result, the arbitration agreement effects as an impermissible prospective waiver of statutory rights. The Supreme Court has said that "a provision in an arbitration agreement forbidding the assertion of certain statutory rights" renders an arbitration agreement unenforceable. Italian Colors, 570 U.S. at 236; see also Mitsubishi, 473 U.S. at 637 n.19 ("[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."). While parties may choose what law governs their contract or how their arbitration is conducted, DIRECTV, 136 S. Ct. at 468, "a party may not underhandedly convert a choice of law clause into a choice of no law clause," Hayes, 811 F.3d at 675.[11]  By limiting the claims available to borrowers to

---

[11] Defendants latch onto generalized language in Supreme Court cases to argue that parties can categorically choose which law applies and what claims can be brought. DIRECTV, 136 S. Ct. at 468 ("[The FAA] allows parties to an arbitration contract considerable latitude to choose what law governs some or all of its provisions, including the law governing enforceability of a class-arbitration waiver. In principle, they might choose to have portions of their contract governed by the law of Tibet, the law of pre-revolutionary Russia . . . ." (citation omitted)). As the Court of Appeals for

tribal-law claims, the arbitration agreement here requires a borrower to prospectively waive claims based on any other law. Like our sister circuits, we conclude that this requirement violates public policy and renders the arbitration agreement unenforceable. Gingras, 922 F.3d at 117-18; Dillon, 856 F.3d at 332; Hayes, 811 F.3d at 668.

Defendants' arguments to the contrary are unpersuasive. First, Defendants argue that for an agreement to be invalid under the prospective waiver doctrine, it must affirmatively disclaim federal law. As support for this affirmative-disclaimer requirement, Defendants rely on language from Supreme Court opinions where the Court declined to credit arguments that the arbitrator would not entertain federal claims because it was not clear from the contracts that the contract waived federal rights. That is not the case here because the arbitration agreement is clear that only tribal-law claims are available, and that pronouncement is enough to show that federal-law claims are unavailable. Gingras, 922 F.3d at 127 ("By applying tribal law only, arbitration . . . appears wholly to foreclose [borrowers] from vindicating rights granted by federal and state law."); Dillon, 856 F.3d at 335-36 (concluding that because the arbitration agreement provides "that the arbitrator shall not allow for the application of any law other than tribal law," the court "interpret[s] these terms in the arbitration agreement as

the Fourth Circuit explained, parties may choose what law will govern an arbitration through a choice-of-law clause (i.e. what procedures will be used and what contract interpretation principles apply), but a choice-of-law clause cannot forbid federal substantive claims from being brought. Hayes, 811 F.3d at 675.

23

an unambiguous attempt to apply tribal law to the exclusion of federal and state law" (emphasis omitted)).

Second, the individual Defendants assert that the arbitration agreement is not an impermissible prospective waiver because borrowers can still "vindicate the substance" of their RICO claim under tribal law. Curry Br. at 36 (emphasis omitted).[12] That is, the individual Defendants argue that Plaintiffs could bring a RICO-like claim under tribal law and receive similar relief. The Supreme Court, however, has framed the prospective waiver question as whether the contract effects an "elimination of the right to pursue [a] remedy." Italian Colors, 570 U.S. at 236 (emphasis omitted); see also Mitsubishi, 473 U.S. at 637 n.19 ("right to pursue statutory remedies"); Penn Plaza, 556 U.S. at 265-66 ("The decision to resolve ADEA claims by way of arbitration instead of litigation does not waive the statutory right . . . ; it waives only the right to seek relief from a court in the first instance."). Thus, the question is whether a party can bring and effectively pursue the federal claim—not whether some other law is a sufficient substitute.[13] Accordingly, by "flatly and categorically

_____

[12] Red Stone does not embrace this argument.
[13] The individual Defendants' argument that an arbitration agreement is not an impermissible prospective waiver when parties can vindicate the substance of their federal claims under another jurisdiction's law misconstrues the Supreme Court's precedent. The Court has explained that an arbitration agreement is enforceable "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." Italian Colors, 570 U.S. at 235 (quoting Mitsubishi, 473 U.S. at 637). Defendants take this "effective vindication" language to mean that a contract

24

renounc[ing] the authority of the federal statutes to which [Defendants are] and must remain subject," the agreement takes the "step" "plainly forbidden" by Supreme Court precedent. Hayes, 811 F.3d at 675. Thus, the arbitration agreement contains a forbidden prospective waiver of statutory rights.

Finally, even if we interpreted the arbitration agreement to allow borrowers to assert claims in arbitration arising under "such federal law as is applicable under the Indian Commerce Clause," the agreement still effects a prospective waiver. RICO, the federal claim Plaintiffs brought here, is a law passed under Congress' Interstate and Foreign Commerce Clause powers. E.g., Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 788 n.4 (3d Cir. 1984), abrogated in part

---

can waive federal rights so long as the applicable law (here, tribal law) allows the party to effectively vindicate the substance of the federal right. The Court has never gone so far. Rather, the Court has held that a party may waive certain procedural guarantees associated with a statutory right (such as the ability to proceed as a class action) so long as the party retains the right to assert the federal claim. Id. at 236-37; see also Hayes, 811 F.3d at 675 (explaining that Italian Colors upheld a class arbitration waiver "because the waiver only reduced the economic incentive to bring a federal antitrust claim" but, critically, "did not prevent a party from pursuing an antitrust claim altogether"). The Court has not indicated that a party can waive the federal right itself. "In fact, the Court stated that the rule against substantive waivers 'would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights.'" Hayes, 811 F.3d at 675 (quoting Italian Colors, 570 U.S. at 236).

25

on other grounds by <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 557 (2007); <u>United States v. Juvenile Male</u>, 118 F.3d 1344, 1348 (9th Cir. 1997). RICO still applies to the Tribe because congressional acts of general applicability apply to Indian tribes. <u>Lazore v. C.I.R.</u>, 11 F.3d 1180, 1183 (3d Cir. 1993). However, as a law passed pursuant to Congress' foreign and interstate commerce powers—not Indian commerce power—it is not a "federal law" made "applicable under the Indian Commerce Clause." As a result, under the loan agreement, Plaintiffs could not bring their RICO claim in arbitration even under Defendants' reading, so the loan agreement effects a prospective waiver.

Furthermore, the text of the loan agreement makes clear that the phrase "such federal law as is applicable under the Indian Commerce Clause" does not capture all federal law or even laws of general applicability. By using the language "such federal law as is applicable under the Indian Commerce Clause," the contract conveys a reference to some subset of federal laws, which notably Defendants never identified to this Court. Even if that subset had been identified, it would demonstrate that at least some federal claims would be excised and hence could not be relied upon (for example, RICO). Our interpretation of the clause "such federal law as is applicable under the Indian Commerce Clause" as referring to a subset of federal law is bolstered by (1) other language in the same section that states that the Tribe and the loan agreement are not "subject to any other federal or state law or regulation," J.A. 292, and (2) several statements in the loan agreement that the lender's voluntary use of federal laws as guidelines "does not represent acquiescence of the Tribe to any federal law unless found expressly applicable to the operations of the Tribe," J.A. 292; <u>see also</u> J.A. 281 (stating that the lender's use of

26

disclosures "does not mean that Lender consents to the application of federal law to any Loan or to this [Loan] Agreement"); J.A. 282-83 (stating that disclosures of the type contemplated under the Truth in Lending Act do not mean the Tribe "concede[s] that the Truth in Lending Act applies to this transaction"); J.A. 291 (stating that arbitration conducted off tribal land does not "allow for the application of any law other than Tribal Law"). For these reasons, even if the arbitration agreement allowed borrowers to bring claims arising under "such federal law as is applicable under the Indian Commerce Clause," the agreement would still create an impermissible waiver of federal statutory rights.

C

The prospective waiver of statutory rights renders the entire arbitration agreement (delegation clause included) unenforceable because the prohibited waiver here is not severable.[14] "Pennsylvania courts have held that if

---

[14] Even if we analyzed the delegation clause entirely separately, we would conclude it is unenforceable. As one district court in this Circuit explained, while the arbitration agreement delegates arbitrability determinations to the arbitrator, it also provides that the arbitrator can only apply tribal law, so

> [t]he arbitrator would be expressly forbidden from relying on any federal or state law, which means that the arbitrator could not ask whether the arbitration clause—and its complete exclusion of federal law—would violate the federal public policy against arbitration clauses

an essential term of a contract is deemed illegal, it renders the entire contract unenforceable" and cannot be severed. Spinetti v. Serv. Corp. Int'l, 324 F.3d 212, 214 (3d Cir. 2003) (emphasis omitted); see also Stewart v. GGNSC-Canonsburg, L.P., 9 A.3d 215, 219 (Pa. Super. Ct. 2010) (holding an arbitration agreement unenforceable when the invalid term was essential). In short, the arbitration agreement's clear reference to the exclusive application of tribal law is intertwined with the arbitration process and is central to it.[15] As the Court of Appeals for the Fourth Circuit twice held, statements in a loan

> that operate as a prospective waiver . . . . Quite possibly, the arbitrator would uphold the arbitration clause, because there would be no principle of federal law standing in the way. Enforcing the delegation clause would effectively allow [the lender] to subvert federal public policy and deny [the borrower] the effective vindication of her federal statutory rights before the arbitration of her claims even began.

Ryan v. Delbert Servs. Corp., No. 5:15-cv-05044, 2016 WL 4702352, at *5 (E.D. Pa. Sept. 8, 2016) (internal quotation marks, alterations, and citations omitted).

[15] Relatedly, the arbitration agreement explicitly states that "[a]s an integral component of accepting this [Loan] Agreement, you irrevocably consent to the exclusive jurisdiction of the Tribal courts for purposes of this [Loan] Agreement." J.A. 291. The arbitration agreement provides that the tribal courts will apply tribal law when reviewing arbitration awards. J.A. 291. Thus, the law the tribal courts will apply is also integral to the arbitration agreement.

agreement that only tribal law applied in arbitration, and that federal law did not apply to the tribe, showed that "one of the animating purposes of the arbitration agreement was to ensure that [the tribe] and its allies could engage in lending and collection practices free from the strictures of any federal law." Hayes, 811 F.3d at 676; see also Dillon, 856 F.3d at 336.

The arbitration agreement here repeatedly states that only tribal law claims can be brought in arbitration. Were we to remove the invocations of tribal law in the arbitration agreement, we would "impermissibl[y] rewrit[e]" the contract. MacDonald, 883 F.3d at 231; accord Dillon, 856 F.3d at 336 ("[A borrower's] consent to application of federal law would defeat the purpose of the arbitration agreement in its entirety."). Because tribal law provisions are "integral to the entire arbitration agreement," they "cannot be severed."[16] MacDonald, 883 F.3d at 232.[17] As a result, "the entire arbitration agreement, including the delegation clause, is unenforceable." Id.; see also Gingras, 922 F.3d at 128 (same).[18]

---

[16] Of equal import is the Hayes court's observation that "severance should not be used when an agreement represents an integrated scheme to contravene public policy." 811 F.3d at 676 (internal quotation marks and citation omitted).

[17] The loan agreement's severability clause does not change our conclusion because a severability clause cannot save an arbitration agreement if the invalid provision is integral to the agreement. Stewart, 9 A.3d at 220-21; accord MacDonald, 883 F.3d at 231 (collecting cases).

[18] Because we conclude that the prospective waiver of statutory rights renders the arbitration agreement unenforceable, we need not address whether the inability to

29

III

For the foregoing reasons, we will affirm the District Court's order denying Defendants' motions to compel arbitration.

---

seek Article III court review of an arbitration award provides a separate ground to hold the arbitration agreement unenforceable, see Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540 (1995) (noting that a lack of "subsequent opportunity for review" at the award-enforcement stage could run afoul of public policy); Gingras, 922 F.3d at 127-28 (holding that an arbitration agreement's "mechanism of tribal court review" was unconscionable), or whether Plaintiffs forfeited the argument.