PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2087

_____

FIELD INTELLIGENCE INC

v.

XYLEM DEWATERING SOLUTIONS INC,

Appellant

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1-19-cv-20590)
District Judge: Honorable Joseph H. Rodriguez

_____

Argued on January 11, 2022

Before: AMBRO, BIBAS, and ROTH, <u>Circuit Judges</u>

(Opinion filed: September 13, 2022)

Christopher Larus
Benjamen C. Linden
Rajin S. Olson
David A. Prange **(Argued)**
Robins Kaplan
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402

Counsel for Appellant

Aaron M. Frankel **(Argued)**
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

Counsel for Appellee

_____

OPINION OF THE COURT
_____


AMBRO, <u>Circuit Judge</u>

Two companies, Xylem Dewatering Solutions and Field Intelligence, entered into two contracts. The first contained an arbitration provision; the second required the parties to litigate their disputes. As sure as Camille coughing in the first scene and dying of consumption in the last, a conflict arose between the businesses. Field Intelligence filed suit in federal court alleging a breach of their second agreement. Xylem,

unconvinced that Field Intelligence's lawsuit did not implicate the parties' first contract, filed an arbitration demand and moved to stay the federal litigation pending the outcome of the arbitration.

Field Intelligence protested. It asked the District Court to hold that the parties' second contract superseded the first such that the arbitration provision contained in that earlier agreement was no longer in effect. While disputing this interpretation of the contracts, Xylem responded that Field Intelligence's supersession challenge could, per the first contract's arbitration provision, only be decided by an arbitrator. The Court disagreed. It held, first, that it had authority to decide the supersession issue and, second, that the parties' later agreement did supersede their earlier contract, thereby eliminating any duty to arbitrate. Xylem appeals both rulings.

We agree with the District Court that it was authorized to determine whether the parties' second agreement superseded, and hence replaced, their first. But we disagree that the first agreement was superseded. We therefore reverse in part, vacate in part, and remand for further proceedings.

## I. Background

Xylem is a water technology company that manufactures and sells large-capacity water pumps. It wanted a better way for its customers to monitor those pumps remotely. In 2012 it called on Field Intelligence to develop a custom telematics solution that would consist of hardware built to interface with the pumps ("Hardware Units" or "Units"), and

3

computer software and support services for monitoring and controlling the equipment.

Two contracts followed. The first, in 2013, was a "Non-Disclosure Agreement." It governed the disclosure and protection of "certain information and related materials" that the parties considered to be "confidential and secret and in which each has a proprietary interest" in connection with their "development of a custom telematics solution." Appx. 531. Significantly, the agreement contained an arbitration provision requiring that any "dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof," be "settled by arbitration in accordance with the Rules of the American Arbitration Association." *Id.* at 533.

The parties launched the first-generation Hardware Units shortly thereafter. Second-generation Units became available around December 2014. Xylem purchased them from Field Intelligence via written Purchase Orders. It also purchased monthly subscriptions that permitted Xylem's customers to access and use Field Intelligence's software via satellite or cellular networks, thereby allowing them to monitor and control their Xylem pumps using the Hardware Units.

There was no written agreement governing Xylem's software subscription purchases until 2017, when the parties signed the second contract relevant to this dispute: the "Software Subscription Service Agreement." It states that Field Intelligence is "the owner of certain proprietary computer software" and "sells subscriptions for subscribers to access and use" that software. *Id.* at 535. The contract allowed Xylem to access the software via a Field Intelligence-hosted website and

4

provided subscription terms and monthly fees based on the number of Hardware Units actively deployed in the field.

The 2017 agreement also contained an "integration clause" (known also as a "merger clause") stating that "[t]his Agreement constitutes the entire agreement between the parties with respect to its subject matter, and supersedes any and all prior or contemporaneous understandings or agreements whether written or oral." *Id.* at 540. And, unlike its predecessor, the 2017 contract contained no arbitration provision, instead requiring any "action under or concerning" that contract to be litigated in a state or federal court in New Jersey. *Id.* at 539.

Eventually, Xylem began building its own hardware. Suspecting Xylem had developed its product by reverse-engineering the Units, Field Intelligence sued it for breach of the 2017 contract, among other things. Per that contract's forum-selection provision, Field Intelligence filed its action in the U.S. District Court for the District of New Jersey. Its complaint did not mention the 2013 contract, let alone allege any breach of that first agreement.

Xylem moved to dismiss on the following rationale: Field Intelligence could not maintain its breach-of-contract claim because, even if Xylem had reverse-engineered the Hardware Units, the 2017 agreement did not bar it from doing so. The District Court rejected that interpretation of the contract and denied Xylem's motion to dismiss in part.

The parties then moved to discovery. Xylem sent Field Intelligence an interrogatory request asking if it intended to

5

rely on the parties' 2013 contract to support any of its claims. Field Intelligence responded that

> Xylem breached the provisions [of the 2013 contract] by copying the design and functionality of the [Hardware Units], modifying [them], using [them] to test and develop Xylem's knock off designs, sending [them] to APD&M for purposes of developing Xylem's knock off designs, and not taking reasonable precautions to protect the[ir] confidentiality . . . .

*Id.* at 827.

A month later, Xylem filed an arbitration demand with the American Arbitration Association seeking various forms of declaratory relief, including a determination that it did not breach the 2013 contract. It then moved to stay the federal litigation pending resolution of the arbitration. It argued that Field Intelligence's interrogatory response revealed for the first time its intent to rely on the 2013 agreement as requiring Xylem to maintain the confidentiality of the Hardware Units. Xylem disputed this interpretation, as it maintained that these questions of contract scope and meaning were not for the District Court to decide but instead delegated to an arbitrator under the 2013 contract's arbitration provision.

Field Intelligence opposed and cross-moved to enjoin the arbitration. Its claim was that the 2017 agreement superseded the 2013 contract such that the earlier agreement to arbitrate ceased. The District Court agreed. It held first that it—rather than an arbitrator—needed to determine whether the 2013 contract was still in effect. Second, it ruled that the 2017

agreement did replace the parties' 2013 contract, thereby eliminating any arbitration obligation contained in the prior agreement. The Court enjoined the arbitration and denied as moot Xylem's motion to stay the federal litigation. This appeal followed.

## II.  Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1332. Our jurisdiction is under 9 U.S.C. § 16(a)(1)(A), which allows us to consider an order refusing a stay pending arbitration. We review anew (or *de novo*) the District Court's denial of Xylem's motion to stay proceedings pending arbitration. *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 395 (3d Cir. 2020) (fresh review where district court has denied a party's "asserted right to have [an] issue submitted to arbitration").

## III.  Discussion

Congress enacted the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, "to reverse the longstanding judicial hostility to arbitration agreements" and place them on "the same footing as other contracts," *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 218 (3d Cir. 2003) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). It "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Arbitration agreements are thus "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a court is "satisfied that the making of the agreement for arbitration . . . is not in issue," it must send the parties to an arbitrator. *Id.* § 4.

Parties may refer more than the merits of their disputes to arbitration. They may also agree to delegate to an arbitrator "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Ctr.*, 561 U.S. at 68–69). This appeal involves such a threshold question: whether Field Intelligence is bound by the arbitration provision in the parties' 2013 contract, or whether the 2017 agreement superseded that contract completely, thereby eliminating its duty to arbitrate.

Two issues stem from this gateway concern. First, who should decide whether the second contract replaced the first, a court or an arbitrator? Second, if a court, rather than an arbitrator, should decide, does the parties' 2017 contract in fact supersede their earlier agreement? Field Intelligence also asks us to consider a third issue: whether Xylem waived any right to seek arbitration under the 2013 contract by participating in this federal litigation. We address each in turn.

**A.**

To the first issue, we hold that the parties' supersession dispute is for a court, not an arbitrator, to decide. That conclusion flows necessarily from a first principle of arbitration law: that "arbitration is strictly a matter of consent." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (alteration adopted) (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010)). An arbitrator's authority is limited to those claims that "the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S.

938, 943 (1995); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986). So before sending parties to an arbitrator, a court must decide whether they agreed to resolve their dispute in that forum, *First Options*, 514 U.S. at 943, which in turn requires it to determine "whether an arbitration agreement exists at all," *Williams v. Medley Opp. Fund II, LP*, 965 F.3d 229, 237 n.7 (3d Cir. 2020) (quoting *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 515 n.4 (5th Cir. 2019)); *Henry Schein*, 139 S. Ct. at 530 ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."). Because the substance of the parties' supersession dispute is "whether there is an agreement to arbitrate," *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019), the District Court rightly declined to send it to an arbitrator.

Xylem asks us to view this case differently. It points to the general rule, referenced above, that parties may delegate threshold arbitrability issues to an arbitrator provided there is "clear and unmistakable" evidence they agreed to do so. *First Options*, 514 U.S. at 944 (alterations adopted) (internal quotation marks omitted). The 2013 contract's arbitration provision, it says, contains such clear and unmistakable evidence, as it expressly delegates arguments over its "termination or invalidity" to an arbitrator. Appx. 533. Hence that person, not a court, must decide the supersession dispute.

Were this fight simply about whether the 2013 agreement had terminated or was invalid, we might agree. But the question here is whether, by the later contract, the parties intended to extinguish their prior agreement and litigate any disputes between them moving forward. Put another way, if

9

Field Intelligence is correct that the 2017 contract superseded the 2013 agreement, then there is no arbitration agreement for us to enforce. And "it can hardly be said that contracting parties clearly and unmistakably agreed to have an arbitrator decide the existence of an arbitration agreement when one of the parties has put the existence of that very agreement in dispute."[1] *MZM*, 974 F.3d at 401; *see also McKenzie v. Brannan*, 19 F.4th 8, 18–20 (1st Cir. 2021) (contract delegating arbitrability issues to an arbitrator cannot provide "clear and unmistakable" evidence of the parties' intent if alleged to be superseded by a later agreement).

Xylem's arguments to the contrary are unpersuasive. It alludes to the so-called "severability" doctrine, under which an arbitration provision (including a provision delegating arbitrability issues to an arbitrator) is severable from the contract in which it is contained and may be enforced despite an assertion that the container contract is invalid. *Prima Paint*

---

[1] Xylem argues that the 2013 agreement's incorporation of American Arbitration Association rules further indicates an intent to arbitrate gateway arbitrability issues. Although "virtually every circuit to have considered the issue has determined that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability," we have yet to decide it in this context. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763 (3d Cir. 2016) (alterations adopted) (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013)). We save it again for another day because, as we explain below, even assuming the 2013 contract's arbitration provision delegates arbitrability issues to an arbitrator, it does not govern this dispute.

*Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967); *Rent-a-Ctr.*, 561 U.S. at 70–71.  But we have held that this doctrine "presumes an underlying, existent[] agreement." *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 106 (3d Cir. 2000).  It does not apply where, as here, the existence of the parties' arbitration agreement has been challenged.

We recently reaffirmed this holding in *MZM*, a case that, like this one, involved a contractual provision purporting to delegate arbitrability issues to an arbitrator.  The dispute there arose from a one-page, short-form agreement hurriedly signed between MZM Construction Co. and a local labor union.  974 F.3d at 392.  The short-form agreement incorporated a separate agreement requiring MZM to make contributions to the New Jersey Building Laborers' Statewide Benefit Funds (the "Funds").  *Id.*  That incorporated agreement contained an arbitration provision.  *Id.* at 393.  When the Funds learned years later that MZM likely was not contributing the required amount (which MZM denied), they indicated they would be submitting the dispute to an arbitrator per that provision.  *Id.*

MZM sued to enjoin the arbitration.  *Id.*  Its claim was fraud in the execution—that the union misrepresented the substance of the short-form agreement to obtain MZM's consent.  *Id.* at 393–94.  Because of this misrepresentation, MZM argued that agreement was void.  *Id.*  The Funds countered that the Court lacked authority to decide the fraud-in-the-execution claim under the incorporated agreement's arbitration provision, which entitled an arbitrator "to decide whether an Agreement exists, where that is in dispute."  *Id.*

11

We disagreed. Because the Federal Arbitration Act requires courts to compel arbitration only when "satisfied that the making of the agreement for arbitration . . . is not in issue," *id.* at 397 (alteration in original) (quoting 9 U.S.C. § 4), they— rather than arbitrators—must "decide questions about the formation or existence of an arbitration agreement, namely the element of mutual assent," *id.* at 397–98. No doubt parties may, as a general matter, delegate arbitrability questions to an arbitrator. But "the legal effect of the delegation must come from an 'independent source' outside the contract whose formation or existence is being disputed." *Id.* at 402 (quoting *Sandvik*, 220 F.3d at 108). "[C]ourts retain the primary power to decide questions of whether the parties mutually assented to a contract containing or incorporating a[n arbitration] delegation provision." *Id.*

Granted, *MZM* dealt with issues of contract formation rather than contract supersession. Our parties, by contrast, do not dispute that the 2013 agreement was valid when executed. But we think the distinction deserves little weight in this context. Like a formation dispute, Field Intelligence's supersession challenge places the parties' mutual assent directly at issue. Its contention is that the parties agreed, by their 2017 contract, not to submit the dispute before us to an arbitrator. A court should rule on that issue before referring a case to arbitration.

To hold otherwise would foster passing strange results. Xylem asks us to enforce the arbitration provision contained in the parties' 2013 contract despite the assertion that it was extinguished and that the parties instead redefined their relationship in the 2017 agreement not to include an arbitration

12

obligation. Were we to do so, parties would never be able to execute a superseding agreement to rid themselves of a prior agreement to arbitrate arbitrability. They would forever be bound by that agreement even if their later dealings show an intent to avoid it. That in turn would undermine our guiding principle in the arbitration context: that "no arbitration may be compelled in the absence of an agreement to arbitrate." *Sandvik*, 220 F.3d at 107–08. We decline to reach such an odd outcome and instead conclude that the District Court was right to resolve the supersession issue itself rather than send it to an arbitrator.

**B.**

Because a court, rather than an arbitrator, must decide whether the parties' 2017 contract superseded their 2013 agreement, we move now to that issue. They agree that New Jersey law governs our analysis. Under that law, supersession is a question of the parties' intent as discerned "from the contracts themselves." *Rosenberg v. D. Kaltman & Co.*, 101 A.2d 94, 96 (N.J. Super. Ct. Ch. Div. 1953). A later contract does not supersede an earlier one unless both concern "the same subject matter" and the later agreement is so "inconsistent" with the former "that the two cannot stand together." *Id.*; *accord Doyle v. Northrop Corp.*, 455 F. Supp. 1318, 1332 (D.N.J. 1978).

According to Field Intelligence, the parties intended the 2017 contract to replace completely their prior agreement, such that the arbitration obligation imposed by that earlier contract no longer exists. It relies primarily on the 2017 contract's merger provision, which (to repeat) states: "This Agreement constitutes the entire agreement between the parties with respect to its subject matter, and supersedes any and all prior

13

or contemporaneous understandings or agreements whether written or oral." Appx. 540. But that statement expressly limits its effect to prior agreements concerning the same subject matter as the 2017 contract. So it alone cannot resolve the parties' supersession dispute; rather, we must first determine whether the 2013 and 2017 agreements involve identical subject matter.

We cannot say they do. The 2013 contract is a "Non-Disclosure Agreement" that applies to the parties' exchange of confidential and proprietary information during their "development of a custom telematics solution." Appx. 531. The 2017 contract, by contrast, is a "Software Subscription Service Agreement," entered after the telematics solution was developed, to provide Xylem and its customers access to Field Intelligence's software for "monitor[ing] the status and operation of remotely located machinery." Appx. 535. And while that later agreement, like the 2013 one, includes protections for Field Intelligence's confidential information, those protections do not extend to information exchanged between the parties prior to their execution of the 2017 contract.

Neither are the two agreements so "inconsistent" that they "cannot stand together." *See Rosenberg*, 101 A.2d at 96. The only potential inconsistency between these documents is their differing dispute-resolution provisions, one of which provides for arbitration while the other provides for litigation. But those provisions are reconcilable. Each is expressly limited to the subject matter of its agreement: the 2013 contract requires arbitration of disputes "arising out of or in connection with *this Agreement*," Appx. 533 (emphasis added), whereas the 2017 contract requires litigation of disputes arising "under

14

or concerning *this Agreement*," Appx. 539 (emphasis added). The result: claims involving the first agreement are heard by an arbitrator, while claims involving the second are heard in court.

One last note. The 2013 contract states that it "may be modified or waived only by an express amendment and waiver in writing signed by the Parties." Appx. 533. Thus, if they meant to supersede that contract and its arbitration obligation, we would expect to see some specific language to that effect in the 2017 agreement. But there is none. The 2017 contract does not even mention its predecessor, let alone expressly indicate any intent to replace that earlier agreement. And with no indication in the 2017 agreement that the parties intended to replace the 2013 contract, we cannot say it was superseded. Accordingly, the 2013 contract's arbitration provision is still in effect, and Xylem was entitled to arbitrate claims tied to that agreement.

**C.**

In a final effort to avoid arbitration, Field Intelligence submits Xylem lost its right to seek such relief by engaging in the federal litigation. We disagree.

A party can waive its ability to arbitrate a claim by litigating it in court.[2] *Gray Holdco, Inc. v. Cassady*, 654 F.3d

---

[2] There is a distinction between waiver and forfeiture. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Brito*, 979 F.3d 185, 189 (3d Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). We note that this may well be a forfeiture dispute, as

15

444, 451 (3d Cir. 2011). But, given the "strong preference" for "enforc[ing] private arbitration agreements," waiver is not lightly inferred. *Id.* The "touchstone" of the inquiry is prejudice, *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 222 (3d Cir. 2007) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 925 (3d Cir. 1992)), which we assess using several factors, including the timeliness of the party's arbitration demand and the extent to which it has contested the merits of (and engaged in discovery with respect to) its arbitrable claims, *see Gray Holdco*, 654 F.3d at 451; *Hoxworth*, 980 F.2d at 926–27 (detailing prejudice inquiry).

There was no prejudice here. Field Intelligence brought its claims under the 2017, not the 2013, agreement. It did not indicate any intent to raise claims under the earlier contract until responding to Xylem's discovery requests. When Xylem asked if Field Intelligence planned to rely on the parties' 2013 agreement to support any of its claims, the latter responded by citing several sections of the 2013 agreement which, in its view, required Xylem to keep confidential and not copy the Hardware Units' design. Following this admission, Xylem did not delay in asserting its rights under that prior agreement: it filed its arbitration demand the next month.

Given that Field Intelligence framed its suit around the 2017 agreement, Xylem did not waive its right to pursue arbitration for claims arising under the 2013 contract merely by engaging in this litigation. *See Forby v. One Techs., L.P.*,

we have no evidence Xylem intentionally abandoned its arbitration rights. Still, because the distinction does not bear on our analysis, we proceed based on how the parties have framed the issue.

13 F.4th 460, 465 (5th Cir. 2021) ("For waiver purposes, 'a party only invokes the judicial process to the extent it litigates *a specific claim* it subsequently seeks to arbitrate.'" (emphasis in original) (quoting *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 328 (5th Cir. 1999))). Field Intelligence asserts harm caused by Xylem's belated arbitration demand, but as its lawsuit focuses on an entirely different contract, it can hardly claim prejudice as to any claims Xylem may bring under the 2013 agreement.

\* \* \*

In sum, while we agree with the District Court that it, and not an arbitrator, was required to determine whether the parties' first agreement was superseded by their second, we do not agree that the earlier agreement was in fact superseded. Because the 2013 agreement still exists, Xylem was entitled to enforce its arbitration provision as to what that contract covers. We therefore reverse the Court's judgment enjoining the arbitration proceedings. We vacate its judgment as to Xylem's motion to stay the federal litigation while arbitration is pending and remand for it to consider the merits of that motion in light of our opinion.