

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00193-CV

_____

COREY MICHAEL CHADWICK, CHADWICK CAPITAL, L.L.C., TEAM ONE PERCENT, L.L.C., AND CRYPTOLAND, L.L.C., Appellants

V.

DEREK LYNN, Appellee

On Appeal from the 481st District Court
Denton County, Texas
Trial Court No. 24-5551-481

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

## I. INTRODUCTION

This is an interlocutory appeal from the trial court's order denying Appellants Corey Michael Chadwick; Chadwick Capital, L.L.C.; Team One Percent, L.L.C.; and CryptoLand L.L.C.'s motion to compel Appellee Derek Lynn to arbitrate his claims against them. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.098(a)(1).

In four issues, Appellants argue that the trial court abused its discretion by denying their motion to compel arbitration because Appellee's (1) challenge to arbitration must be resolved by an arbitrator, (2) claims are within the broad scope of the arbitration provision, (3) claims must be arbitrated against all Appellants, and (4) challenges to the enforceability of the arbitration provision must be resolved by an arbitrator. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In early 2022, Chadwick began pitching investors for a game that he was developing called CryptoLand—a crypto-based digital video game platform that is accessed and played online. CryptoLand is a "pay-to-play and play to earn game" where players use cryptocurrency to make in-game purchases of NFTs[1]—e.g., digital avatars, digital plots of land, and other digital resources—that, depending on how well a player performs, can increase in value as the game is played. Chadwick represented

---

[1]NFT stands for "non-fungible token," which is a unique digital asset.

that CryptoLand would use a cryptocurrency coin called "$Crypto"—a coin that he already owned the right to use.[2]

In March of 2022, Chadwick spoke with Appellee and explained that he (Chadwick) would sell CryptoLand's NFTs to Appellee at a discounted price—66.67% below their current market valuation. Chadwick represented that purchasing these NFTs at the proposed discounted price would ensure and increase Appellee's future earning margins and that he could earn his investment back by (1) playing the CryptoLand game and receiving $Crypto coins and (2) purchasing NFT avatars and NFT plots of land from the game that would increase in value and could be sold to players.

Chadwick made several representations to Appellee regarding the terms of the game, including that (1) CryptoLand would be released in the summer of 2022, (2) there would be no limit to withdrawing funds from the game after its release, (3) CryptoLand's original inventory would consist of 10,000 NFT plots of land and 10,000 NFT avatars, and (4) Chadwick had the resources to fund the game's liquidity pool.[3] On April 1, 2022, Appellee wired Chadwick $150,000 for the NFTs in

---

[2]At the time Chadwick was pitching investors, $Crypto was valued at approximately $50.

[3]Appellee claimed that the liquidity pool is a crucial component because it "provides a pool of funds that makes it possible for various activities like the exchange of [$Crypto] for fiat money that can be transferred to a 'real-world' bank card."

CryptoLand. No written agreement memorialized this contract, and neither party asserts that it contained an arbitration provision.

Due to various complications and setbacks,[4] CryptoLand was not released until the spring of 2023. Following the game's release, Chadwick implemented "Cryptoland Platform Terms of Services," which included an arbitration provision.[5] The relevant portion of the arbitration provision read:

> In consideration for our provision of the Platform to you, you and CryptoLand each agree that any and all disputes or claims arising under, out of, in connection with, or related to your use of the Platform, these Terms in any fashion, or the subject matter, negotiation, performance, termination, interpretation, or formation of the agreement resulting from your acceptance of these Terms, (a "Dispute") must be resolved exclusively in binding arbitration.

Upon accessing CryptoLand, Appellee discovered that Chadwick had changed the terms of the game by (1) increasing the number of NFT plots of land from 10,000 to 20,000—thus diluting the market demand and value for NFT plots of land in the game, (2) changing $Crypto as the medium of exchange within the game to an in-game token called Cryptopium, and (3) limiting fund withdrawals from CryptoLand's

---

[4]Appellee alleged that Chadwick had "attempted to purchase his own NFTs at inflated prices from different wallets to try to artificially inflate the value of the NFTs on the open market." This conduct caused CryptoLand to be flagged for suspicious activity. Appellee asserted that Chadwick's actions had, as a consequence, "devalued the NFTs and tarnished the game's reputation."

[5]The arbitration provision stated that arbitration would be governed by the "Judicial Arbitration and Mediation Services ("JAMS") pursuant to its Comprehensive Arbitration Rules."

4

platform.[6]  Appellee also learned that Chadwick had not funded the game's liquidity pool.

Appellee sued Appellants—Chadwick, Chadwick Capital, Team One Percent, and Cryptoland—for (1) violations of the Texas Securities Act; (2) common law fraud; (3) fraud in a stock transaction; (4) money had and received; (5) unjust enrichment; (6) imposition of constructive trust and disgorgement of funds; (7) conspiracy; and (8) declaratory relief arising from his $150,000 investment.

Relying on Cryptoland's Terms of Service, Appellants[7] moved to compel arbitration.  Appellants asserted that in order to play the game, "players are required to read and agree to the Terms of Service which provide very broadly that all disputes will be determined by binding arbitration."  Appellants alleged that Appellee had agreed to the Terms of Service by repeatedly clicking the "Agree & Continue" button and continuing to play the game.  They explained that the Terms of Service had been last revised on March 8, 2023, and that Appellee had agreed to the Terms of Service

---

[6]Appellee complains that he has 15,000 in-game tokens, and because of Chadwick's change to CryptoLand's terms—restricting conversion to 0.5 tokens per day—it will take him "more than 80 years to convert the tokens to something of value outside the game."

[7]Neither Chadwick nor Appellee attempt to explain the relationship between Chadwick Capital, Team One Percent, and CryptoLand to Chadwick or Appellee's claims.  Rather, Chadwick's and Appellee's filings collectively refer to all of them as "Defendants" in the trial court and "Appellants" in this appeal.

5

by accessing CryptoLand's platform on April 4, 2023.[8]  From April 4, 2023, through June 27, 2023, Appellee had accessed and used CryptoLand, which was subject to the Terms of Service and its arbitration provision.  Appellants maintained that all of Appellee's claims fell within the arbitration provision's broad scope.

Appellee argued that (1) he was an investor—not a player; (2) arbitration provisions are not applied retroactively without an express agreement; (3) the fraud claims are outside the scope of the arbitration provision; (4) Chadwick, Chadwick Capital, and Team One are not parties or third-party beneficiaries of CryptoLand's Terms of Service; and (5) the "clickwrap" nature of the Terms of Service render them unenforceable.  Appellee also asserted that based on Appellants' timeline, he did not click on the Terms of Service until April 4, 2023; however, he was damaged as an investor long before the Terms of Service had been posted on the platform.  He maintained that his claims arose out of his investment and not as a player or user of CryptoLand's platform and that his damages arose from fraudulent misrepresentations Chadwick had made to him in 2022.  Finally, Appellee argued that in order to prove the existence of an agreement to arbitrate created by means of a click-through transaction, Appellants had to prove the efficacy of the security

---

[8]Appellee disputes whether the Terms of Service were on CryptoLand's platform when he accessed it and maintains that the first time he saw the Terms of Service was when Appellants attached it as an exhibit in a filing with the trial court.

6

procedure employed to verify that he had electronically "signed" the agreement by clicking the box.

Appellants replied that because the arbitration provision delegated arbitrability to an arbitrator, the "gateway" issue of contract formation and arbitrability must itself be resolved by an arbitrator—not by the court. They also argued that (1) it did not matter whether Appellee was an investor or player;[9] (2) Appellee had ratified the arbitration provision by accepting the benefits; (3) the fraud claims were not outside the scope of the arbitration provision; (4) Chadwick, Chadwick Capital, and Team One were related parties; and (5) clickwrap agreements are enforceable.

Following a non-evidentiary hearing, the trial court denied Appellants' motion to compel arbitration without specifying a basis for its ruling. No findings of fact were requested by either party, and none were made by the trial court. This interlocutory appeal followed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.098(a)(1).

### III.  STANDARD OF REVIEW AND APPLICABLE LAW

A party seeking to compel arbitration bears the burden to establish (1) the existence of a valid arbitration agreement and (2) that the disputed claims fall within the scope of that agreement. *Wagner v. Apache Corp.*, 627 S.W.3d 277, 284 (Tex. 2021); *see J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *see Lennar Homes of*

---

[9]Chadwick portrays Appellee's $150,000 payment not as an investment but an "up-front payment to play CryptoLand at a discounted rate." He contends that "the only contract that [Appellee] entered into with Appellants" was the Terms of Service on CryptoLand's platform, which contained the arbitration provision.

7

*Tex. Land & Constr., Ltd. v. Whiteley*, 672 S.W.3d 367, 376 (Tex. 2023). "[W]hen we are called upon to decide whether the parties have agreed to arbitrate, we do not resolve doubts or indulge a presumption in favor of arbitration, because no party may be forced to submit to arbitration in the absence of [a] sufficient showing that the parties entered into a valid and binding arbitration agreement." *Wright v. Hernandez*, 469 S.W.3d 744, 751 (Tex. App.—El Paso 2015, no pet.). But if the party seeking arbitration meets its two-pronged burden to establish the agreement's validity and scope, then the burden shifts to the party opposing arbitration to raise a valid defense to the agreement's enforcement, and absent evidence supporting such a defense, the trial court must compel arbitration. *J.M. Davidson, Inc.*, 128 S.W.3d at 227–28.

We review a trial court's order denying a motion to compel arbitration for an abuse of discretion, deferring to the trial court's factual determinations if they are supported by the record. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). We cannot conclude that a trial court abused its discretion merely because this court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

But we review de novo the trial court's legal determinations, including whether a valid arbitration agreement exists and whether the claims fall within the scope of an

8

arbitration agreement. *Labatt Food Serv.*, 279 S.W.3d at 643. Similarly, all "gateway matters" are questions of law that we review de novo. *Lennar Homes of Tex. Land & Constr., Ltd.*, 672 S.W.3d at 376.

Because the trial court here did not enter specific findings of fact or conclusions of law to explain its denial of the motion to compel arbitration, we infer that the trial court made all necessary findings to support its ruling. *Kmart Stores of Tex., L.L.C. v. Ramirez*, 510 S.W.3d 559, 565 (Tex. App.—El Paso 2016, pet. denied). And, because no findings or conclusions were entered, "we must uphold the trial court's decision on any appropriate legal theory urged below." *APC Home Health Servs., Inc. v. Martinez*, 600 S.W.3d 381, 389 (Tex. App.—El Paso 2019, no pet.).

## IV.  DISCUSSION

### A.  THRESHOLD ARBITRABILITY DETERMINATION

In their first issue, Appellants argue that "[Appellee's] effort to escape arbitration suffers from a fatal threshold deficiency—an arbitrator must resolve his challenges to arbitration. For that reason alone, the trial court abused its discretion by denying Appellants' motion to compel."

In support of this argument, Appellants maintain that "Arbitrators resolve challenges to the validity of an agreement as a whole and also challenges to an arbitration agreement's scope when parties delegate that issue to the arbitrator." They contend that because CryptoLand's arbitration provision delegates challenges to its validity and scope to the arbitrator, those issues should have been resolved by an

arbitrator and not by the trial court. Because there is a conflict regarding which contract governs, the trial court—not an arbitrator—must decide whether the parties' first contract was superseded or subsumed by their second contract.

## 1. Applicable Law

As we discussed above, under both Texas and federal law, a party moving to compel arbitration has the initial burden of establishing (1) the existence of a valid arbitration agreement that (2) covers the plaintiff's claims. *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 720 (Tex. 2023); *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018) (applying the FAA).

Who decides—the court or an arbitrator—whether a movant met this burden depends on the type of challenge a party resisting arbitration raises and also whether the parties' arbitration agreement delegates resolution of the challenge to an arbitrator. *See TotalEnergies*, 667 S.W.3d at 716. Courts generally decide whether a valid arbitration agreement exists. *Cerna v. Pearland Urban Air, LLC*, 714 S.W.3d 585, 588 (Tex. 2025). But when the challenge is to the contract in which the arbitration agreement is embedded instead of the arbitration provision itself, an arbitrator must resolve the challenge. *TotalEnergies*, 667 S.W.3d at 701.

Courts resolve challenges to an arbitration agreement's scope "unless the parties have clearly and unmistakably delegated that issue to the arbitrators." *Id.* at 720. Under Texas and federal law, when the parties' arbitration agreement states they will "arbitrate in accordance with the AAA or similar rules"—like the JAMS

10

rules—they have clearly and unmistakably agreed that an arbitrator must resolve a scope challenge. *Id.* at 708, 712, 720–21 (holding that an arbitration agreement that incorporated the AAA rules delegated a scope challenge to the arbitrator); *Maravilla v. Gruma Corp.*, 783 F. App'x 392, 396 (5th Cir. 2019) ("the adoption of specific arbitration rules—such as JAMS—shows that a party knowingly intended to arbitrate gateway issues of arbitrability"). When parties have delegated arbitrability to an arbitrator, a court "possesses no power" to decide a scope challenge and, instead, "must enforce that agreement just as they must enforce an agreement to delegate resolution of the underlying merits to the arbitrator." *TotalEnergies*, 667 S.W.3d at 702, 721 n.33.

However, when "parties have agreed to two contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 152, 144 S. Ct. 1186, 1194 (2024). "To hold otherwise would be to impermissibly elevate a delegation provision over other forms of contract." *Id.*

### 2. Competing Contracts

There are two contracts in competition for governance of this dispute. The first contract—the 2022 investment agreement—contains no arbitration provision. The second contract—CryptoLand's 2023 Terms of Service—contains an arbitration provision that incorporates the JAMS rules that evidences the parties' intent to

delegate arbitrability. Per this provision, an arbitrator must decide any and all disputes under the second contract, including whether a given disagreement is arbitrable.

Appellee argues that he cannot be compelled to arbitrate his claims because the investment agreement—the first contract—did not contain an arbitration provision and that he "never agreed to arbitrate the claims . . . asserted in his lawsuit." Appellee maintains that all of his claims arose out of the first contract and that he had been damaged prior to the existence of the second contract. Appellants counter that the second contract superseded the first contract when Appellee accessed CryptoLand's platform and ratified the arbitration provision by playing the game. In other words, Appellants contend that the second contract governs this dispute.

However, neither the first contract nor the second contract contains language that it supersedes or controls other contracts or conflicts. Thus, there are two contracts, resulting in conflicting answers of who decides arbitrability. The parties' dispute boils down to which contract controls—neither contract indicates whether it controls over the other in the event of a conflict. Thus, the question that must be answered is whether there is an agreement to arbitrate that applies to this particular dispute.

If Appellants are correct that the second contract was meant to govern all agreements and disputes, then the parties agreed to arbitrate all subsequent arbitrability disputes. If Appellee is correct that the first contract governs, then the

12

parties intended to send disputes arising under that contract to the court because there is no arbitration provision.

Thus, the question whether these parties agreed to arbitrate arbitrability can be answered only by determining which contract applies. In other words, the substance of the parties' dispute is "whether there is an agreement to arbitrate." *Field Intel. Inc. v. Xylem Dewatering Solutions Inc.*, 49 F.4th 351, 356–57 (3rd Cir. 2022). Considering the conflict between the first contract's lack of an arbitration provision and the second contract's arbitration provision, the question is whether the parties agreed to send the given dispute to arbitration—that question must be answered by a court.

The United States Supreme Court unanimously held that

> [i]n cases where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration. But, where, as here, parties have agreed to two contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs.

*Coinbase*, 602 U.S. at 152, 144 S. Ct. at 1194; *see Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 480 (Tex. 2022) ("Because the parties here dispute whether their arbitration agreement continued to exist after the 2012 settlement agreement, we agree with the trial court and court of appeals that courts must decide that issue."). To hold otherwise would be to impermissibly "elevate [a delegation provision] over other forms of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71,

130 S. Ct. 2772, 2778 (2010) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n.12, 87 S. Ct. 1801, 1806 (1967)).

We conclude that the trial court, not an arbitrator, should have determined whether the parties' first contract was superseded by their second contract. Accordingly, we hold that it was proper for the trial court to answer the threshold question of who should have the primary power to decide whether the parties agreed to arbitrate the merits. *See Coinbase*, 602 U.S. at 152, 144 S. Ct. at 1194.

We overrule Appellants' first issue.

## B. DENIAL OF ARBITRATION

In their second, third, and fourth issues, Appellants appear to assume that the trial court found either that the second contract governed Appellee's claims or that the second contract subsumed the first contract. Neither assumption is supported by the trial court's order.

Appellants' brief centers on CryptoLand's arbitration provision and argues that all of Appellee's claims fall within its broad scope. However, Appellants neglect to address the broader scope issue: whether it is the first contract or the second contract that governs Appellee's claims. The trial court's order denying arbitration resolved this scope issue.

As we discussed above, because the two contracts conflict regarding arbitration, the trial court was tasked with determining which contract governed Appellee's claims. *See Coinbase*, 602 U.S. at 152, 144 S. Ct. at 1194. The trial court

14

could have determined that all, some, or none of Appellee's claims were governed by the second contract—which would have compelled Appellee to arbitrate those claims. Because the trial court did not make findings of fact or conclusions of law to explain its denial of Appellants' motion to compel arbitration, we infer that the trial court made all necessary findings to support its ruling. *Ramirez*, 510 S.W.3d at 565.

Here, the trial court implicitly found that none of Appellee's claims were governed by the second contract, evidenced by its denial of arbitration as to all of Appellee's claims against all Appellants. The trial court evidently determined that the first contract—which did not contain an arbitration provision—governed all of Appellee's claims. Therefore, we cannot conclude that the trial court erred by refusing to compel arbitration wherein the parties in the first contract did not enter into an arbitration agreement. *See United Rentals, Inc. v. Smith*, 445 S.W.3d 808, 812 (Tex. App.—El Paso 2014, no pet.) (affirming the denial of a motion to compel arbitration when there was no agreement to arbitrate). Accordingly, we hold that the trial court did not abuse its discretion by denying Appellants' motion to compel arbitration.

We overrule Appellants' second, third, and fourth issues.

## V. CONCLUSION

Having overruled Appellants' four issues, we affirm the trial court's order denying their motion to compel arbitration. *See* Tex. R. App. P. 43.2(a).

15

/s/ Brian Walker

Brian Walker
Justice

Delivered:  November 6, 2025